ANTHONY W. BASTIAN *et al.*

*v.*

THE MODERN WOODMEN OF AMERICA *et al.*

*Filed at Ottawa May 11, 1897.*

1. CORPORATIONS—*power of corporation to perform corporate acts outside the State of its creation.*  In the absence of a statute to the contrary, a corporation has no power to perform strictly corporate acts outside the State of its creation.

2. BENEFIT SOCIETIES—*statutory requirements must be observed on amending articles of association.*  A change in the articles of association of an incorporated benefit society must be made in accordance with methods previously assented to by its members, and the statutory provisions relating thereto must also be observed.

3. SAME—*change in location of principal office—when not binding on members.*  Where an incorporated benefit society has by its fundamental law fixed its principal office at the place designated in its articles of association, such principal office cannot be changed, so as to bind members of the society, without the amendment of both its fundamental law and its articles of association.

4. SAME—*act of June 22, 1893, repealed conflicting provisions of act of 1887, as amended in 1893.*  Section 10 of the act of 1893, concerning benefit societies, (Laws of 1893, p. 134,) is in conflict with section 18*a* of the act of 1887, as added by the act of 1893, (Laws of 1893, p. 116,) and repeals the conflicting provisions of that section.

5. SAME—*benefit society cannot change its principal office at a meeting held outside the State.*  A benefit society organized under any law in this State, which has applied for permission to continue business under the act of 1893, concerning benefit societies, (Laws of 1893, p. 130,) is prohibited by section 10 of that act from changing the location of its principal office at a meeting held in another State.

6. SAME—*right of members of benefit society to bring suit against it.*  Section 12 of the act concerning benefit societies, (Laws of 1893, p. 135,) which provides for the bringing of suits against such societies by the Attorney General, has no reference to controversies between individual members of the society and the officers thereof to prevent the consummation of acts contrary to its fundamental law or its articles of association.

7. INJUNCTION—*when benefit society will be enjoined from removing its principal office.*  A benefit society, which has appropriated a large sum of money to defray the cost of the unauthorized and illegal removal of its principal office, may be enjoined, at the suit of members of the society contributing to its support and interested in its funds, from consummating such removal.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Whiteside county; the Hon. JAMES SHAW, Judge, presiding.

JOHN M. HAMILTON, and FRANK D. RAMSEY, for appellants:

A subsequent statute which is general does not abrogate a former statute which is particular, and a general law does not operate as a repeal of a special law on the same subject, passed at the same session. *Ottawa* v. *LaSalle County*, 12 Ill. 341.

At common law corporations cannot transact legislative corporate business outside the State of their creation. *Reichwald* v. *Commercial Hotel Co.* 106 Ill. 450.

A member of a corporate body may invoke the aid of equity to prevent a breach of trust by the majority of the members. High on Injunction, sec. 1184.

A corporation acts under the authority of the charter of the State in which it is then acting, and that only, the legislation having no operation beyond its territorial limits. *Quincy Bridge Co.* v. *Adams County*, 88 Ill. 619.

A corporation cannot enact or pass a by-law, or any rule or resolution for its government, except within the State under whose laws it is organized and where it has a corporate existence. *Mitchell* v. *Vermont Copper Mining Co.* 40 N. Y. Sup. 406.

Acts done by directors in exercise of their powers as agents of the corporation can be lawfully done outside the State, but not corporate acts. *Reichwald* v. *Commercial Hotel Co.* 106 Ill. 450.

J. G. JOHNSON, and JACKSON & HURST, for appellees:

Repeal by implication is not favored. *Hyde Park* v. *Cemetery Ass.* 119 Ill. 144; *Hunt* v. *Railway Co.* 121 id. 642; *Butz* v. *Kerr*, 123 id. 66; *Quincy* v. *O'Brien*, 24 Ill. App. 591; *Netherby* v. *People*, id. 273.

A statute will never be held to repeal by implication, if, on any reasonable hypothesis, it can be avoided. . *Butz* v. *Kerr,* 123 Ill. 660; *Hyde Park* v. *Cemetery Ass.* 119 id. 144.

Although the words of the statute are broad enough in their literal extent to comprehend existing cases, they must yet be construed as applicable only to cases that may thereafter arise, unless a contrary intention is unequivocally expressed therein. *People* v. *McClellan,* 137 Ill. 359; *Means* v. *Harrison,* 114 id. 250.

The legislature, provided it does not violate constitutional provisions, may pass retroactive laws, such as, in their operation, may affect suits pending, and give to a party a remedy he did not previously possess, or modify an existing remedy, or remove an impediment in the way of legal proceedings. *Hepburn* v. *Coates,* 7 Watts, 300.

Substantial and positive injury must always be made to appear to the satisfaction of a court of equity before it will grant an injunction, and acts which, though irregular and unauthorized, can have no injurious result, constitute no ground of relief. High on Injunction, sec. 9.

An injunction should never be granted except in a clear case of irreparable injury, with the full conviction on the part of the court of its urgent necessity. *Potter* v. *Schenck,* 1 Biss. 515; *Citizens' Coach Co.* v. *Railway Co.* 29 N. J. Eq. 299.

If it is apparent, upon an application for an injunction, that the relief sought is disproportionate to the injury sustained or likely to be sustained, the court will decline to interfere. *Hall* v. *Healey,* 40 Mich. 46.

Equity will not interfere by injunction to prevent an injury merely nominal or theoretical in its nature, even though an action at law might be maintained. *Newby* v. *Comrs. of Highways,* 21 Ill. App. 245; *Bassett* v. *Salisbury Co.* 47 N. H. 426.

Where an injunction might cause irreparable damage to defendant in the event of plaintiff not being exclusively entitled to relief, the injunction will be refused.

*Hartridge* v. *Rockwell,* R. M. Charlt. 260; *Jones* v. *Newark City,* 11 N. J. Eq. 452; *Torrey* v. *Railroad Co.* 18 id. 293.

An injunction will not be granted where the right is doubtful. *Cooper* v. *Railroad Co.* 3 Phila. 262; *Water Co.* v. *McAllam,* 5 id. 93; *Steamboat Co.* v. *Livingston,* 3 Cow. 713; *Manhattan Gas Light Co.* v. *Barker,* 36 How. 233.

Before a court will be justified in declaring the act void because in conflict with a constitutional provision, the repugnance must be clear and irreconcilable. *Cummins* v. *Chicago,* 144 Ill. 563.

Whether a corporation has acted in violation of its charter is a question that can only be raised by the State, except where the law allows a private citizen to bring suit to test the question. *Knealey* v. *Railroad Co.* 69 Mo. 660.

Illegal acts of a corporation can be attacked by a private citizen only where legislative permission is given. *Martindale* v. *Railroad Co.* 60 Mo. 510.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

This suit was begun in 1892, in the circuit court of Whiteside county, by the filing of appellants' bill to restrain the Modern Woodmen of America and its officers, the appellees, from removing the principal office of that corporation from Fulton to Rock Island, in this State. A temporary injunction was granted, and the parties reached a final decision in favor of appellees in that court in 1896, by which the injunction was dissolved and the bill dismissed for want of equity, at the cost of appellants. The Appellate Court has affirmed the decree.

The Modern Woodmen of America is a fraternal beneficiary society, having a lodge system with a ritualistic form of work. It was incorporated in 1884 under an act entitled "An act to provide for the organization and management of corporations, associations or societies for the purpose of furnishing life indemnity or pecuniary benefits to widows, orphans, heirs, relatives and devisees of

deceased members, or accident or permanent disability indemnity to members thereof," in force July 1, 1883, which was revised and amended by the act for similar purposes in force July 1, 1887. By the articles of association the principal business office was located in Fulton, and by the "Fundamental Laws" of the corporation, subsequently adopted, it was further provided that said principal office should be at that place. The local lodges are called "camps," and the complainants are residents of the city of Fulton, members in good standing of the corporation and of Forest Camp No. 2 of the said city of Fulton. The supreme legislative and governing body is called the "Head Camp," which holds its sessions biennially at such time and place as the preceding head camp may determine. The head camp consists of officers of the corporation and standing committees, together with delegates elected by the local camps. The bill charged that at a meeting of the head camp held in Omaha, Nebraska, in 1892, an attempt was made to change the location of said principal office, so fixed by the articles of association and fundamental laws at Fulton, to the city of Rock Island, and that the action taken was illegal and invalid. The charge of invalidity was on two principal grounds. The fundamental laws provided that they might be amended by the head camp by a two-thirds vote of the authorized delegates present, and it was alleged that there were not two-thirds of the delegates present who voted for the change; that there were 103 members present; that only 56 voted in favor of the change, and that these included officers and committeemen, members of the head camp, who were not delegates. The other ground was that the head camp was powerless to act in a matter of that kind because convened in a foreign State.

The answer admitted that complainants were members in good standing of the corporation, that it was incorporated and its principal office located at Fulton both by the articles of association and the fundamental laws,

and that the vote at Omaha included officers and members of committees, but it asserted their right to vote, denied that the vote was less than two-thirds, and denied that the office could only be changed by amending the fundamental laws. Afterward, by leave of court, the defendants filed a supplemental answer at the October term, 1895, alleging that the articles of association and fundamental laws of the corporation had been amended by a two-thirds vote of the delegates present at a head camp held at Madison, Wisconsin, in June, 1895, changing the location of the principal office from Fulton to Rock Island. Replications were filed to the answers, and the final hearing of the cause was, by agreement, on the merits upon these pleadings and the evidence of the respective parties.

The defendants do not seem to have regarded the action of the head camp at Omaha as sufficient to sustain their claim of a right to remove the office, since they permitted the suit to rest and the injunction to remain in force for nearly three years,—until after the head camp had been held at Madison. At the latter camp new and original action for a change of location was taken, without any reference to the previous action at Omaha. A certificate of the change of location was filed in 1895 by the officers of the corporation with the insurance superintendent of this State, wherein they certified that the change was made by the head camp at Madison and no mention whatever was made of any action at Omaha. Notwithstanding this practical abandonment it is now contended that the proceedings at Omaha were sufficient to change the location and were valid, and that, if there was an infirmity in the proceedings on account of the corporate meeting being held outside of the State, such objection was removed by a ratifying act passed by the legislature of this State.

With reference to the power of a corporation to perform corporate acts outside of the State of its creation,

where the laws of its corporate existence have no force, the general rule is that such power does not exist. This general rule was recognized by this court in *Reichwald* v. *Commercial Hotel Co.* 106 Ill. 439. In some cases it has been held that action by the corporation outside of the State of its creation is null and void. (*Aspinwall* v. *Ohio and Mississippi Railroad Co.* 20 Ind. 492; *Miller* v. *Ewer*, 27 Me. 509; *Hilles* v. *Parrish*, 24 N. J. Eq. 380.) Another view is, that such proceedings are voidable at the election of dissenting members of the corporation. (Morawetz on Private Corp. sec. 488; Cook on Stock and Stockholders, sec. 589.) Of course, members or stockholders may be estopped by their consent to, participation in or ratification of the act done. (*Handley* v. *Stutz*, 139 U. S. 417.) There was no authority, at the time the head camp met at Omaha, to perform in the State of Nebraska corporate acts, strictly so called, against the will of members of the corporation, and such an act as changing the articles of association, which formed the basis of the corporation, is unquestionably of that character. The incorporators were required to state in their application the place where the principal business office should be located, and a copy of this application was to be made a part of the certificate of organization which was to be recorded in the office of the recorder of deeds of the county in which such office was located. The location was an essential and material part of the articles. There was no estoppel against the objecting complainants, and the action was invalid under all the authorities, even if it was in all respects regular in form.

But after the action at Omaha, the act under which the society was incorporated, as amended in 1887, was further amended by adding thereto section 18*a*, as follows: "Any corporation, association or society that has heretofore or may hereafter organize under the act designated in section 1 of this act, or that has been organized under an act of which said act designated in said

section 1 is an amendment, may transact any business outside of the State of Illinois that it can or may do in the State of Illinois, and any business heretofore transacted outside of this State by any such organization, which would be legal if done within this State, is hereby legalized and made valid." (Laws of 1893, p. 116.) This amendment recited that an emergency existed, and it took effect on its approval, June 19, 1893. It is claimed that the business transacted at Omaha was legalized and made valid by this amendment; but this would only be so in case such business would have been legal and binding on complainants if done within this State, and this makes it necessary for us to consider whether such action would have amounted to a legal change of the principal place of business if done here.

The authority to change the articles of association was derived from that clause of the act of 1887 before referred to, which is as follows: "Any corporation, association or society organized under this act, or the act hereby revised and amended, may change its articles of association in the manner prescribed by its own rules; but no such change shall be of legal effect until a certificate setting forth fully and definitely the changes proposed shall have been submitted to and approved by the Auditor of Public Accounts and filed in the office of the Secretary of State, and a certified copy thereof recorded in the office of the recorder of deeds in which the original certificate of association was recorded." (Laws of 1887, sec. 3.) It was only upon a substantial compliance with this statute that the articles of association could be changed, and a material requirement was that the change should be made in the manner prescribed by the rules of the corporation. The right to change the articles of association involved changes in the entire plan of incorporation, subject only to the provisions of the statute, including the name of the corporation, its plan of doing business, the number of its directors, and the limits as

to age of those insured, not exceeding that fixed by the statute. These were most important matters, and the manner of making such changes must have the assent of the members, expressed in some lawful way. What conditions they might see fit to impose for the exercise of such a power could only be known by the rules which they might prescribe. The Modern Woodmen of America had never adopted any rule prescribing the manner of doing such an act, either by its head camp or otherwise. It had adopted fundamental laws, which fixed the location of the principal office at the same place as the articles of association, and had provided the method of amending such fundamental laws, but had made no provision for amending the articles. The bill proceeded upon the theory that the change could only be made by the head camp by a two-thirds vote of the delegates from the local camps, in the method pointed out for amending the fundamental laws, while on the other hand it is claimed that it could be done in any manner and by a majority vote, and that the provision in the fundamental laws has no application.

We think that in order to accomplish a change binding upon the members it was necessary to amend both the articles and the fundamental laws. The public law of the State governing the corporation required the office to be located at Fulton until a change should be made in the articles in compliance with the law and the Auditor of Public Accounts should approve of the change. The corporate body, by its fundamental laws, also ordained that the location should be at Fulton, and that no change should be made except by a vote of two-thirds of the delegates present at a head camp. It cannot be denied that these laws were binding between the members and the corporation, and fixed the location of the office until they should be changed in the manner therein provided. Now, the head camp at Omaha did not attempt to amend the articles of association or the fundamental laws. If there

had been a rule prescribing the manner in which a head camp could amend the articles, and it had been attempted to amend them and the fundamental laws, the fact that the methods adopted were crude or the proceedings irregular would not be sufficient reason for holding them invalid if there had been a substantial compliance with the law. The courts do not look with favor upon mere technical objections in such cases, and endeavor to carry out the will of the members although informally or irregularly expressed. But in this case there was not only no rule existing and none adopted by the head camp, but there was no attempt to change the articles of association or amend the fundamental laws. It was resolved that a ballot should be taken and the city receiving a majority of the votes be declared the choice of the head camp; that the committee on revision of laws report the necessary change to carry out such choice, and that the board of directors and other head officers be instructed, upon the final adoption of the fundamental laws, to take the necessary legal steps to carry out the choice of the head camp as to location of the head office. A ballot was taken and votes were cast for five different places. The total vote was 103, of which Rock Island received 56,—less than two-thirds, including officers and members of committees. The head consul then announced that Rock Island, having received the requisite number of votes, was the choice of the head camp, and that the committee on revision of laws should report necessary changes, etc., according to said resolution. The committee on revision of laws did not report any change to be made and there was no adoption of a fundamental law or any change of the articles or the law, but the board of directors were afterward, by resolution, merely ordered to take the necessary legal steps to bring about the change of location. Inasmuch as there was no rule prescribing the manner of changing the articles of association, and no attempt was made to change them or amend the fun-

damental laws by which the members had bound them-
selves, but a mere effort to change the location of the
office in violation of them, the act would not have been
valid if performed in this State, and therefore was not
made valid by the subsequent amendment.  The articles
of association could not be changed at a meeting held
beyond the limits of this State, and if the fundamental
laws could be so changed it was not in fact done.  The
supplemental answer of defendant shows that the head
camp at Madison abandoned and ignored the action at
Omaha as of no force or effect.  But, aside from that fact,
we think it was not valid for the reasons given.

At the head camp held in Madison, Wisconsin, in
June, 1895, a rule was adopted for changing the articles
of association, and it was ordered that the board of di-
rectors should amend them and the fundamental laws in
such particulars as might be directed by a two-thirds
vote of any head camp.  The location of the office was
changed to Rock Island and the board of directors re-
quired to amend the articles and fundamental laws ac-
cordingly, and this action was certified by the directors
to the insurance superintendent, who had been substi-
tuted for the Auditor of Public Accounts.  The same ter-
ritorial objection is made to this action, and the further
objection that the head camp ordered the board of direct-
ors to do the amending, and the board of directors acted
on the supposition that the head camp had done it, and
between the two no amendment was made.  It is true
that the proceedings were irregular and defective in form
in·the particulars pointed out, but we think they would
be sufficient for the purpose intended if such action could
be taken outside of this State.  Whether it could or not
depends upon the question whether the above quoted sec-
tion 18a was still in force.

The amendment went into effect June 19, 1893.  The
act to which it was added permitted the organization of
incorporations to do insurance on the assessment plan,—

whether in the ordinary mode, or as fraternal beneficiary societies having a lodge system with a ritualistic form of work; and at the session of the legislature in 1893 two acts were passed separating these classes of insurance corporations and enacting a separate code for each. Both of these acts were approved June 22, 1893. The one providing for incorporating companies doing the business of life or accident insurance on the assessment plan, and to control such companies, provided for the re-incorporation of existing domestic corporations under that act, with the right to continue to exercise all the rights, powers and privileges not inconsistent with said act, pursuant to their articles of incorporation. It expressly repealed the act of 1887, with this proviso: "*Provided,* that the repeal of said act and nothing herein contained shall affect secret or fraternal corporations, associations or societies organized under said act or the act of which it is an amendment, but the same shall be and remain in full force and effect as to them." This act went into effect July 1, 1893. The other act was entitled "An act to provide for the organization and management of fraternal beneficiary societies for the purpose of furnishing life indemnity or pecuniary benefits to beneficiaries of deceased members, or accident or permanent indemnity disability to members thereof, and to control such societies of this State and of other States doing business in this State, and providing and fixing the punishment for violation of the provisions thereof, and to repeal all laws now existing which conflict herewith." Section 1 of this act, after defining a fraternal beneficiary society, provides, "all such societies shall be governed by this act," and it is admitted that the Modern Woodmen is such a society as is there defined. Section 2 is as follows: "All such societies coming within the description as set forth in section 1 of this act, organized under the laws of this or any other State, province or territory and now doing business in this State, shall be considered duly or-

ganized and may continue such business: *Provided*, that they hereafter make application for such permission and comply with the provisions of this act regulating annual reports, and the designation of the Auditor of Public Accounts as the person upon whom process may be served, as hereinafter provided." The Modern Woodmen made the application provided for in this section for permission to continue business, October 24, 1893, and thereby assented to be governed by the provisions of the act applicable to it. The act further provides for the organization of new corporations under it, and section 10 is as follows: "Any such society organized under the laws of this State may provide for the meetings of its legislative or governing body in any other State, province or territory wherein such societies shall have subordinate bodies, and all business that has heretofore or may hereafter be transacted at such meetings, except so far as the same may relate to the removal of the principal place of business, shall be valid, in all respects, as if such meetings were held within this State; and where the laws of any such society provide for the election of its officers by votes to be cast in its subordinate bodies, the votes so cast in its subordinate bodies in any other State, province or territory shall be valid as if cast within this State." The thirteenth section provides penalties for any person who shall act within this State as an officer, agent or otherwise for any society which shall have failed, neglected or refused to comply with or shall have violated any of the provisions of the act. All laws or parts of laws in conflict with the act were thereby repealed. It contained an emergency clause, and was in force on its approval.

It seems clear that the Modern Woodmen of America came under the government and control of this act which went into force June 22, 1893, under the provision that all societies of that character should be governed by it and the application to continue business in pursuance of

its requirement. So far, then, as any provision of the amendment 18*a* was in conflict with this act, such provision was repealed, and the exception in the express repeal of the act of 1887 by the other act could not keep such inconsistent and repealed provision alive. It is contended that the provision that all societies like the Modern Woodmen shall be governed by the act, and for continuing business under it, only applies to the making of annual reports and the designation of the insurance superintendent for service; but the provision for government and the penalties provided for violation of any of the provisions of the act were general, and cannot be limited to annual reports or the service of process. That the provision in section 18*a* is in conflict with section 10 of this later act is plain. Section 10 is not limited to societies organized under that act, but includes "any such society organized under the laws of this State." It says that all business that has heretofore been transacted in any other State shall be valid, as well as business hereafter transacted. Societies to be organized under the new law could not have transacted such business out of the State before the passage of the act. In sweeping terms that section included all societies such as the Modern Woodmen, and both validated what had already been done by them outside of the State and gave power to transact business beyond its limits, except business relating to removal of the principal office. That exception amounted to a prohibition from taking action of the character excepted outside of the State, and such a limitation was in conflict with section 18*a*, which was thereby repealed.

It is also contended that under the provisions of section 12 of the act of 1893 no suit could be maintained against a corporation of this character except by the Attorney General. That section has no reference to a controversy like this between the individual members and the corporation or its officers to prevent the consum-

mation of an act contrary to the articles of association and fundamental laws. It relates only to proceedings to prevent the corporation from doing business within the State for a failure to comply with the act. Complainants were members of the order, contributing to its support and interested in its funds. A large sum was appropriated from the funds of the order to be expended in connection with and for the purpose of the proposed removal. If the action was unlawful and in violation of the compact between them and the corporation, they were entitled to prevent its consummation.

Being of the opinion that the proceedings complained of were illegal, the judgment of the Appellate Court and the decree of the circuit court are reversed, and the cause is remanded to the circuit court, with directions to enter a decree perpetually enjoining the removal of said principal office under or pursuant to the proceedings of the head camp at Omaha and Madison herein before mentioned.

*Reversed and remanded.*