## James H. Wallace et al., Appellees, v. Modern Woodmen of America et al., Appellants.

INSURANCE, § 712*—*what essential to validity of amendment of articles of association of benefit society.* To constitute a valid amendment of the articles of association of a beneficial association organized under the Act of 1893 relating to "Fraternal Beneficiary Societies," the record of the proceedings of the association must show a substantial compliance with section 7½ of the Act, J. & A. ¶ 6654, which provides that articles may be changed in the manner prescribed by the rules of the association, and where the record of the proceedings does not show the adoption of an amendment by the number of votes required by its rules, there is no valid amendment.

Appeal from the Circuit Court of Sangamon county; the Hon. ROBERT B. SHIRLEY, Judge, presiding. Heard in this court at the April term, 1913. Affirmed. Opinion filed July 2, 1914.

TRUMAN PLANTZ, GEORGE W. MILLER, NELSON C. PRATT, CHARLES J. SCOFIELD, SIDNEY S. BREESE and NORTHCOTT & ORR, for appellants.

E. S. SMITH, for appellees.

PER CURIAM. This is a bill for an injunction to restrain appellant and its officers from putting into effect a certain by-law claimed to have been adopted by the Head Camp of the Modern Woodmen of America at an adjourned meeting held in Chicago in January, 1912.

The Modern Woodmen of America is a fraternal beneficiary society having a lodge system with a ritualistic form of work, and was incorporated in 1884. The general purpose and object of the association has been determined in the following cases: *Bastian v. Modern Woodmen of America,* 166 Ill. 595, and *Park v. Modern Woodmen of America,* 181 Ill. 214, and need not be further stated herein.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The injunction is sought on the ground that said by-law is unreasonable and void and that under the law fraternal beneficiary associations are only authorized to levy assessments for the purpose of providing a sufficient surplus to reasonably provide for the emergency of suddenly increased death losses, and on the further ground that neither said by-law nor the change in the articles of the association authorizing and validating said by-law were legally adopted. The chancellor in the court below held that said by-law was unreasonable and void and granted a perpetual injunction against its enforcement.

Prior to the alleged adoption of the disputed by-law, the articles of association provided that the funds for the payment of death losses were to be realized from assessments on *surviving* members. Each member when he joined the association paid a certain rate according to his age at that time, and assessments were laid from time to time, as needed, to pay the death losses and expenses. The number of these assessments averaged from eight to ten a year.

The new by-law materially and radically changed the plan of insurance that had theretofore existed in said association, and at the time of its alleged adoption the articles of association of appellant contained no provision authorizing the adoption of a by-law providing for the plan therein embraced, and it was sought to validate said by-law by changing the articles of association so as to authorize it.

The new plan provided that one assessment each month should thereafter be laid regardless of the necessity therefor and also for a step-rate system of amounts to be paid as assessments. The step-rate system is one by which the member pays each year or group of years according to the actual cost of the society of the protection furnished him, and thus increases each year or group of years as age increases, as distinguished from the level rate by which the mem-

ber pays more than the actual cost in the earlier years and less than the actual cost in the later years. The new by-law provided:

"Benefit Plan 1. From and after January 1, 1913, every beneficial member, heretofore or hereafter adopted, failing to elect prior to January 1, 1913, some other benefit plan, as herein authorized, and whose certificate is dated prior to May 1, 1912, shall be liable for, and shall during each and every calendar month during his life pay death benefit assessments, to be determined by his attained age, at his nearest birthday, on said January 1, 1913, in accordance with the following table of Whole Life Level Assessment Rates."

Here follows a table of rates for attained ages from eighteen to fifty-four and over, ranging from 75 cents per $1,000 at eighteen years to $3 per $1,000 at the age or fifty-four and over, payable monthly. This plan further furnishes an option whereby a member whose assessment rate exceeds $2 per $1,000 may pay $2 per $1,000 assessment in cash and have the remainder of his rate compounded annually charged as a lien against his certificate, but which he may discharge by payment during his lifetime.

This plan is compulsory unless the member elects to accept one of five other options. These options are based upon the step-rate system. As an illustration, option plan 4 provides that the member who had not passed his forty-fifth birthday January 1, 1913, who might elect prior to January 1, 1913, so to do, could surrender his old certificate and procure one for a term expiring on his fiftieth birthday, upon a rate to be paid at his attained age, according to the table set forth in this plan. This provided for term protection to age fifty.

The principal object and purpose of these changes is to provide for a larger surplus, and the effect is to greatly increase the rates of assessments. The increase in some cases amount to five hundred per cent.

At the time the by-law was adopted the association had a surplus of over $9,000,000. The evidence shows that the proposed change in rates would produce an accumulation or surplus of from $15,000,000 to $20,000,000 a year and that in ten years there would be created thereby a surplus of at least $150,000,000. The evidence does not show that there was any immediate necessity for such a large surplus, but on the contrary it was shown that the association was in a flourishing condition and under the present system of rates had accumulated a surplus of over $9,000,000, as above stated.

Section 5 of the articles of association prior to the alleged change therein provided, among other things, as follows:

"The funds for the payment of death losses or accident indemnity are to be realized from assessments on surviving members. The funds for the payment of the ordinary expenses of doing the business are to be realized by assessments on its members, thus creating a 'General Fund.' The funds collected to pay death losses or accident indemnity is known as the 'Benefit Fund' and can be appropriated for no other purpose. The Local Camps shall be subordinate to and shall report to the Head Camp. The Head Camp shall pay all losses from the benefit fund collected from the surviving members of the Fraternity by the proper officers of the Local Camps and shall have same forwarded to the Head Camp and by its officers disbursed."

The Head Camp recognized the fact that the plan provided by the new by-law could not be sustained under the above section of the articles of association, and proceeded to change said section by leaving out the word "surviving" and having it read as follows:

"The funds for the payment of death losses shall be created and maintained by assessments on the members and by interest on or other accretions to said fund and shall be known as the benefit fund."

The validity of the by-law, in so far as its adoption is concerned, depends upon whether the change in the articles of association was legally made.

Section 7½ of the Act in regard to the organization and management of fraternal beneficiary societies, in force 1893 (J. & A. ¶ 6654), adopted by the association, provides as follows: "Any corporation, association or society organized under the provisions of this act, amended by this section, may change its articles of association in the manner prescribed by its own rules, etc." One of the fundamental laws of the association was that the articles of said association might be changed at any session of the Head Camp by resolution duly designating and setting forth the change sought to be made, and the affirmative vote of two-thirds of the members of such Head Camp should be necessary to the adoption of such resolution. The record of the proceedings of the Head Camp shows that the resolution for the change in the articles of association was put to a *viva voce* vote and an announcement made that it was unanimously adopted. The record does not affirmatively show how many members of the Head Camp were present when the vote was taken, but it does affirmatively show that a number were not present at that time. There is nothing in the record of said proceedings to show that two-thirds of the members of the Head Camp voted in favor of said resolution or that there was a quorum of said Head Camp present and that two-thirds of the quorum voted for said resolution. The resolution might

have been voted for unar      usly by those present and
yet not have received tl      :quisite two-thirds vote in
the affirmative. While        undoubtedly true that in
the passage of an ame.        ' or in abrogation or re-
peal of ordinary by-law;      . association or corpora-
tion that a majority vc       ' those entitled to vote
thereon will be sufficient    :hat ordinarily the law
will presume that a ma        were present and that
said by-law was legally p     . yet such rule and pre-

sumption cannot obtain as to the adoption of resolutions changing the articles of association. The latter embraced the powers, rights and privileges granted by the sovereign power of the State and can only be changed in the manner provided by the sovereignty which grants them. The statute provided that the articles of association of appellant could be changed in the manner provided by its own rule, which was by an affirmative vote of two-thirds of the delegates of the Head Camp, and while the courts do not look with favor upon mere technical objections in such cases and endeavor to carry out the will of the members although informally or irregularly expressed, yet there must be a substantial compliance with the law. It was immaterial what manner or method of vote was adopted, or how the vote was announced or recorded, provided that the record shows that there was an affirmative vote of two-thirds of the delegates of the Head Camp. *Bastian v. Modern Woodmen of America, supra.* The question whether the presumption would be that this resolution was regularly adopted in collateral proceedings is not involved, as this is a direct proceeding by the members of the association itself challenging the legality of its adoption, and unless the articles of association were lawfully changed then the by-law in question would have no effect. Where the statute prescribes the manner in which the articles of association of a corporation of this character may be changed, the records of the association must show a substantial compliance with such requirements. The records of the proceedings in regard to the adoption of this resolution failing to show its adoption in the manner required, and as there was no provision in the articles of association then in force authorizing the adoption of said by-law, said by-law necessarily becomes void and inoperative.

The decree of the Circuit Court will therefore be affirmed.

*Affirmed.*