OSCAR M. VOORHEES, Plaintiff in Error, *vs.* DAVID C.
CAMPBELL *et al.* Defendants in Error.

*Opinion filed October 24, 1916—Rehearing denied Dec. 6, 1916.*

1. FRAUD—*when fiduciary relation is established party receiving benefit must show absence of fraud.* Transactions between a party and one bearing a fiduciary relation to him are, upon motion of the dependent party, *prima facie* voidable upon grounds of public policy, and, the fiduciary relation being established, the burden of proof is upon the one receiving the benefit to show an absence of fraud by establishing such facts as will satisfy the court that the dealing was at arm's length or that the transaction was had in the most perfect good faith and was equitable and just.

2. SAME—*what does not show that sale of land was in good faith.* Where the agent and his principal in a land deal occupy a fiduciary relation and the agent is the dominant party the transaction will not be held to have been in good faith, where the evidence shows that the agent took advantage of the confidence reposed in him and grossly misrepresented the value of the property and falsely represented that it was owned by a third party, whereas he, in fact, owned it himself.

3. SAME—*laches will not apply until the discovery of the fraud.* Where a cause of action arises from fraud, *laches* will not apply in equity until the discovery of the fraud or until the fraud could have been discovered by the exercise of reasonable diligence.

4. SAME—*failure to use diligence to discover fraud is excused where fiduciary relation exists.* The failure to use diligence to discover fraud is excused where there is a relation of trust and confidence which renders it the duty of the party committing the fraud to disclose the truth to the other.

5. SAME—*when acts by defrauded party will not be held to be an affirmance of his contract.* Acts done by a defrauded party in furtherance of the contract before he is in possession of the facts relative to the fraud are not an affirmance of the contract such as will bar relief in a suit instituted by him, after discovering the fraud, to rescind the contract on that ground.

6. SAME—*when paying taxes on property purchased will not estop party to rescind contract.* It is the duty of one who receives the title to property to pay the taxes on it, and one who pays taxes on land which he was fraudulently induced to buy will not thereby be held to have affirmed his contract, since if he fails to pay the taxes he will be unable to restore the property as he received it.

7. SAME—*a party seeking to rescind must tender what he received under the contract.* Where a party discovers that fraud has been practiced upon him in making a contract he should tender what he received under the contract as a condition to its rescission.

8. SAME—*what does not prevent rescission of contract.* The rescission of an executed contract for the purchase of a large number of vacant lots from a real estate agent who owned them and who continued to handle the property for the non-resident complainant is not precluded by the fact that some of the lots have been sold to third parties where the complainant offers to return to the defendant all the money received from the sales, as in such case the purchase money will take the place of the lots, and the defendant, having negotiated the sales, cannot say they sold for an inadequate price.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. THOMAS TAYLOR, JR., Judge, presiding.

CLELAND, LEE & PHELPS, for plaintiff in error.

TENNEY, HARDING & SHERMAN, for defendants in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

On July 8, 1908, Oscar M. Voorhees, the plaintiff in error, filed his bill of complaint in the circuit court of Cook county against David C. Campbell, John A. Campbell and Charles P. Campbell, the defendants in error, for rescission of an executed contract of sale of certain real estate by defendants in error to plaintiff in error on the ground of fraud perpetrated upon plaintiff in error by defendants in error. Defendants in error answered the bill, denying the charges of fraud. Replication was filed to the answer, and the cause was referred to the master to take the evidence and report the same, together with his findings, to the court. The master found that no fiduciary relation existed between plaintiff in error and defendants in error at the time the real estate in question was purchased by plaintiff in error; that no material false representations were made by defend-

ants in error to plaintiff in error at any time; that plaintiff in error had knowledge of all the facts upon which he relies in this suit as early as 1904, 1905 and 1906, and is therefore guilty of *laches;* that the parties cannot be placed *in statu quo,* and it would therefore be inequitable to grant the relief sought; that plaintiff in error is not entitled to any relief and that the bill should be dismissed for want of equity. Exceptions filed to the master's report were overruled and a decree was entered by the court dismissing the bill for want of equity. The record of the circuit court has been brought here for review by writ of error.

Defendants in error were at the time of the transactions between them and plaintiff in error, and had been for some years prior thereto, engaged in the real estate business in the city of Chicago. Their business was conducted under the name of the Campbell Investment Company. Plaintiff in error was a clergyman, then residing in the State of New Jersey but now residing in the city of New York. During the year 1894 the defendants in error began to send to the plaintiff in error circular letters concerning real estate which they were offering for sale in and about Chicago. Plaintiff in error finally became interested in the investments offered by defendants in error in these circular letters, and in January or February, 1898, wrote to defendants in error. Upon receipt of the letter from plaintiff in error the defendants in error sent one of their agents to call upon plaintiff in error at his home in New Jersey, and as a result of negotiations between plaintiff in error and this agent, plaintiff in error on March 10, 1898, purchased from defendants in error two lots in Beverly Hills, in Chicago, for $950 cash, and received a deed therefor executed by John A. Campbell, one of the defendants in error. Before purchasing these lots plaintiff in error wrote to certain persons residing in Chicago whose names had been furnished him by defendants in error as references, one of them being a clergyman, and, according to his testimony, received

"very flattering references" from these persons. Plaintiff
in error did not personally investigate these lots before pur-
chasing them and did not personally meet any of the de-
fendants in error, but relied upon the letters which he had
received regarding the honesty and integrity of defendants
in error and the statements made by defendants in error in
their circular letters and the representations made by their
agent through whom plaintiff in error purchased the lots.
Thereafter occasional letters passed between plaintiff in er-
ror and defendants in error with reference to the lots, and
each year plaintiff in error received notice from defendants
in error of the taxes due on the lots and plaintiff in error
paid these taxes.

For some time prior to 1902 defendants in error were
interested in a subdivision known as Oaklawn, lying outside
the city of Chicago. On May 3, 1900, defendant in error
Charles P. Campbell obtained title to block 35, lots 23 to
34, inclusive, of block 40, block 41, block 37, except lot 12,
and block 38, except lots 3 and 42, in Minnick's Oaklawn
subdivision of a certain tract, by deed from Victor L. Cun-
nyngham, for an expressed consideration of one dollar.
The revenue stamps affixed to the deed show that the real
consideration for these lots and blocks was between $4500
and $5000. From a release deed executed by Edwin G.
Lancaster, trustee, to Charles P. Campbell on March 18,
1902, it appears that at the time Charles P. Campbell pur-
chased the above described property from Cunnyngham he
mortgaged the same to secure a loan, the amount of which
is not disclosed by the record before us. Thereafter, on
September 24, 1900, block 37, except lot 12 thereof, and
block 38, except lots 3 and 42 thereof, were sold by the
master in chancery under decree in a chancery suit brought
by Ella M. Sutherland, to Charles P. Campbell for $1900,
and deeds therefor issued to Campbell December 26, 1901.

Under date of January 14, 1902, defendants in error
sent plaintiff in error a letter reading as follows;

"We have been thinking for some time of selling or trading your lots 19 and 20, in block 27, Hilliard & Dobbins' subdivision, Beverly Hills. We are free to confess that the real estate market in Chicago has not been as active for the past two years as we thought it would be, but it is beginning now to pick up quite a good deal; inquiries are stronger and sales are being made. Of course, one has to pick the location yet before he can find property that is at all active.

"For the past three years we have been at quite a considerable expense in the way of improving a subdivision known as 'Oaklawn,' about which we have undoubtedly written you. It is in the southwestern part of the city of Chicago and is exceptionally desirable for a residence district. There are local conditions that make it desirable, also, from an investment point of view. We have purchased in the neighborhood of fifteen hundred lots in all, and only recently have we had offered to us what we consider to be an exceptional bargain in acres that join our subdivision on the south. This is a five-acre block and a two and a half-acre block.

"I enclose a plat of our subdivision proper, and have marked just where blocks 37 and 38 are. Block 37, you will notice, is south, just across the street from our block 29. Lots in block 29 have sold, and are selling, for $400 and $440 each. The average price of the lots in this block has been $420. There are but five lots left in the block, so you can see the forty-five lots have sold for $18,060.

"There is a slight difference in the lay of the land, however, between blocks 29 and 37 and 38. Blocks 37 and 38 pitch a little bit to the south, and the southern part of these two blocks is not quite such high ground as is block 29, although it is all good. The west half of block 38 sold the early part of last month for $1400 an acre, and the person who purchased it considered he was getting a bargain in these acres.

"We have the other seven and one-half acres for sale, and I think I have gotten the owner to consent to take your two lots in block 27, Beverly Hills, as part trade on these acres. The price of the acres would be $10,500. I have told the owner that I thought we could handle his acres provided he would take your lots in block 27 for $2100. I figured your lots this way in order that you might have a fifth interest in these acres, provided you decided to take them. This is with the understanding that you can organize a syndicate, say, of four other men in your town, letting each of them go in for $2100. These acres will subdivide into sixty-three lots, and I have figured that all the lots will readily sell at an average of $300. They certainly ought to if the property just across the street, north, sells for $420.

"We would undertake to sell the property for such a syndicate, at such figures, upon the following basis: That their money should

be returned to them, with six per cent interest added, before any portion of the profits should be divided, but that we should take out of the gross selling price:

"First, the exact cost of putting the property on the market; and this would not be great, because the property is improved, has sidewalks, graded streets and trees, so the only expense would be advertising, commissions, taxes, abstracts, etc.

"Second, the return of the money invested, with six per cent interest on same from the time it was invested, to the syndicate, and after that a division of the profits between the syndicate and the Campbell Investment Company.

"I do not know, Mr. Voorhees, that I could get such a trade through, but I have been talking it, and if you could see your way clear to form such a syndicate, raising $8400 cash, we would endeavor to complete the trade. This property is on the market only for a limited time, for I am confident it will be sold. The west two and one-half acres of block 38 were sold within nine days after the property was offered. This has not been offered to anyone else that we know of.

"I wish you would write me at once regarding this proposed trade.

CAMPBELL INVESTMENT COMPANY,

C. P. Campbell.

"P. S.—It might be wise for you to come on to Chicago and look at this property. We would only be too glad to have you come if you could."

The plat referred to in this letter showing the territory called Oaklawn and the location of blocks 37 and 38 with reference to Oaklawn was inclosed. Upon this plat appeared the following written or printed matter: "The part by the lake is being prepared in highest manner by Col. J. F. Foster, landscape architect. Drains, sewers, artesian water-works, electric light works, macadam streets and cement or broken-stone sidewalks, native trees, supplemented by rows of trees in the streets, ornamental plantations on island and shore, the stream of surface water turned into the sewer, the surplus artesian water turned into the lake, and the hills and woods made the most of. This part is between the railroad track, Ninety-fifth street, West Fifty-fourth street and West Fifty-sixth street. The rest is only improved in the usual manner: streets and sidewalks made, but not paved, and rows of trees planted."

On January 17, 1902, the defendants in error and Theodore P. Shonts, who was related to defendants in error, entered into a contract whereby defendants in error agreed that Shonts should hold certain property of defendants in error, including their Oaklawn property, as security for money then loaned and to be loaned by Shonts to defendants in error, and thereafter, on January 22, 1902, Charles P. Campbell conveyed to Shonts all property standing in his name in Minnick's Oaklawn subdivision. While the deed of January 22 was filed for record in Cook county soon after its execution, it appears that it was not properly indexed in connection with blocks 37 and 38, which fact thereafter gave rise to controversy concerning who was the holder of the record title at the time of the conveyance of these blocks to the plaintiff in error, hereinafter mentioned. From the testimony of Shonts and Charles P. Campbell given before the master it appears that Shonts had arranged with one of the Chicago banks to extend credit to defendants in error, Shonts guaranteeing payment of the same, and that the contract and conveyance above mentioned were executed for the purpose of securing Shonts upon his guaranty to the bank, and that Shonts never had any other interest in the property involved in this controversy.

The reply made by plaintiff in error to the letter of January 14 from defendants in error was not offered in evidence. Thereafter, under date of January 20, 1902, defendants in error sent the following letter to plaintiff in error:

"Your prompt reply to my letter of the 14th inst. is received. I was especially anxious that you make this trade for your two lots in Beverly Hills for two reasons: (1) You were selling your lots in Beverly Hills at a good price. The percentage that you are receiving on your lots, as you undoubtedly have figured, was larger and better than you could possibly have expected. (2) You were getting in trade seven and one-half acres of property that would subdivide into sixty-three lots, which, if sold for $300 per lot, would be a selling price of $18,900.

"The facts about the property were given in my former letter, and from these you can see why I thought the lots would sell for $300 each. Anyone purchasing at that figure would, I feel sure, make a good per cent on his investment. In fact, we would recommend any of our clients to purchase lots at this price. But for the sake of argument let us put the price at $250 per lot. This would make the selling price $15,750. You are really purchasing property for $10,025. This allows you $1250 for your lots in block 27, Beverly Hills, with five years' interest on your investment at six per cent, so that the net profit on this investment, if the lots only sold for $250 each, would be $5725.

"If it were possible for us to get the owner of this land to sell only the five acres and allow you this much for your lots we would do it, and if you have a proposition to make on that basis, at the same rate per acre, and you will so state to us, we will see what can be done. Were we in your place we would make a proposition on the five acres for $7500, taking your two lots in exchange for $2100, making $5400 that you would have to raise. We would also make a proposition on a time purchase, viz., one-third cash and the balance in one and two years. We know we could get five per cent on the deferred payments.

"The investment looks to be exceptionally good and we are confident we can do well for you in this. Let us hear from you, please, again.

CAMPBELL INVESTMENT COMPANY,<br>C. P. Campbell."

Plaintiff in error answered this letter on January 30, 1902, stating, among other things, the following: "I do not doubt in the least the value of your proposition but I still feel estopped from making efforts to raise money on investment. I cannot feel that it is the proper thing for me to do, and I am not possessed of the means in my own right to enter into the project alone. It is not that I do not have need of such profits that seem quite certain in a case like this, for such would be doubly acceptable. I might ask what in your judgment would be the time required to put the lots on the market and sell them,—that is, from your experience how long would the money be tied up?" The answer sent by defendants in error to the letter of January 30 was as follows:

"We have yours of the 30th relative to the investment we offered you in ours of the 20th. Frankly, Mr. Voorhees, we will

state that we have been holding this property awaiting your decision. Three other people have been looking at it, but we have not given very much encouragement to them because we were anxious to know your final decision in the matter.

"The movement of real estate in this particular section has been very free, caused by the development of the Stickney Transfer Yards, immediately north of our Oaklawn property. We wish you would read carefully the enclosed leaflet about these transfer yards. You cannot help but increase values rapidly if you induce tremendous corporations to come within sixteen blocks of your property and spend millions of dollars in developing a gigantic enterprise there. This is what has been done very near our Oaklawn property. The general public, however, does not know so much about Stickney and what is being done. In the early spring their announcements will be made. We think those who buy now in Oaklawn are buying just a little ahead of the market.

"Answering your question, will state that we cannot tell exactly how long it will take us to sell the lots in this seven and one-half acres should you purchase them, but if they sell as rapidly as did the east two and one-half acres of block 38, leaflet of which we enclose, the property will not be on the market more than sixty or ninety days. We placed these lots on the market about two weeks ago and they have been snapped up by investors.

"As to the number of lots we have already sold in Oaklawn, will state that we have disposed of about 350 out of the 525 we originally had there. We are not now offering to sell any of them, as we wish to hold what we have there until activity begins around Stickney.

"If we thought, Mr. Voorhees, that there was a likelihood of your being able to purchase these acres or to organize a syndicate, and you would like to have our Mr. E. H. Bouton come to New Jersey, we would be glad to have him do so. He expects to be in western Pennsylvania the first of next week, but, of course, we would not want him to go to New Jersey and be at this expense unless there was a likelihood of the deal going through. We could furnish you hundreds of testimonials from people who have invested through us and who have made good per cent on their money. We would like for you to get in on these acres, because it looks as though we could make you a large per cent, not only on what money you have already invested but upon what you would invest.

"Let us know, please, by return mail, if possible, if you want our Mr. Bouton to come on to Three Bridges. If so, we will wire him by Wednesday of next week, etc.

CAMPBELL INVESTMENT COMPANY,
C. P. Campbell."

On February 5, 1902, plaintiff in error replied, in part, as follows: "In reply would say that I have not made very great progress in the syndicate matter, though the case is not quite as hopeless as it seemed. I thank you for your interest in the matter, and while I am not in a position to suggest that your representative come on here as you propose, I will venture one more question,—*i. e.*, if money should be paid in installments, as you suggested, what amount would be required on first payment and when would payment have to be made? If the matter is still open I should be glad to know exact conditions or terms that can be secured. If this comes too late you will have the satisfaction of knowing that the failure was not due to your lack of interest. I only regret that I cannot say yes at once."

After receiving the letter of February 5 the defendants in error on February 8, 1902, wrote the plaintiff in error as follows:

"Our Mr. Bouton was delayed on his trip to western Pennsylvania. * * * He expects to be in Pittsburg on Tuesday morning. * * * If you reply at once to this letter, asking him to come to Three Bridges, N. J., we will have him go down.

"In my letter to you of January 20th I suggested that your two lots at Beverly Hills be turned in on five of the seven and one-half acres, putting your lots at $2100. I find that the owner of these seven and one-half acres will not sell any part of them but desires to dispose of them all. I have gotten him to agree to take your lots at $2100 on the seven and one-half acres, leaving a balance of $8400, one-third of this amount to be paid in cash, balance in one and two years, with five per cent interest on deferred payments.

"Now, Mr. Voorhees, these are the terms we have gotten from him. It may be that he would make better terms; we do not know; but we cannot get him to vary a bit in his price. The deal must be closed by the 20th at latest, and the one-third cash payment will have to be made at that time.

"As I wrote you in my letter of the 1st, I think I know exactly where we can sell these acres. All we would have to do would be to offer them. We wanted to turn your lots in on these at this time, and we think it is a good thing for you.

CAMPBELL INVESTMENT COMPANY,
C. P. Campbell."

On February 11, 1902, plaintiff in error acknowledged receipt of the letter of February 8, and stated that as he had not been able to secure the promise of the necessary funds so as to accept the offer, he did not feel justified in wiring defendants in error to have their representative come to Three Bridges; that he was anxious to sell his lots at a good figure and wondered if this was the only opportunity to dispose of them; that he could give no assurance that would warrant defendants in error in holding the tract for him, and that unless the defendants in error received a message from him by the following Friday "you had best count me out of the deal. I do not wish to stand in the way of your disposing of your option elsewhere."

On February 18, 1902, defendants in error sent a letter to plaintiff in error, signed by C. P. Campbell, containing the following: "I have again seen the owners of the property referred to in our correspondence and have gotten them to agree to extend the time for the closing of this deal. I have told them that I have it practically sold, but I must have more time about it." After referring to the fact that Bouton was then in Pittsburg and that the writer desired him to call upon plaintiff in error and assist in closing up the matter, the letter continued: "I am inclosing you some expressions from people with whom we have done business in the last few months. These persons have, you can see, been able to turn their investments and are very much pleased with them. I can, I know, do as well by you if not a great deal better." Plaintiff in error replied to this letter under date of February 21, 1902, stating that he would be glad to see the representative of defendants in error if they felt it worth while to send him; that there were many questions in his mind that the representative would no doubt be able to answer. Under date of February 24, 1902, defendants in error wrote plaintiff in error that on account of illness Bouton had been unable to

call upon him but that plaintiff in error could expect him in a short time.

On February 27, 1902, plaintiff in error wrote defendants in error inquiring whether there was a possibility of receiving from the sale of lots sufficient to meet the deferred payments, and whether he was correct in his understanding that defendants in error would receive no regular commission for selling the lots "and only receive your remuneration when the deal is completed,—*i. e.,* you trust to the success of the transaction for your reward." The reply of defendants in error, dated March 1, 1902, contained the following statements: "You are to receive your money, together with six per cent interest on the same, before we, as a company handling your property, get anything for our time and trouble. In other words, our remuneration comes after you have gotten your money back and six per cent interest. If anything comes up that the owner decides to act differently about this property we will wire you. Our Mr. Bouton will see you probably within a week or ten days."

Shortly after March 1, 1902, Ely H. Bouton, mentioned in the foregoing correspondence, called upon the plaintiff in error at his home in New Jersey. He told plaintiff in error that defendants in error were honorable men, with wide experience in Chicago property, and that plaintiff in error need have no fear in trusting them implicitly; that they never made less than ten per cent for their clients who did as they asked; that they were anxious to dispose of the seven and one-half acres because the owner must have money, and it was offered to defendants in error at a rate about $100 less than property in Oaklawn was worth; that the property was almost immediately salable in lots at the figure named by defendants in error; that the first payment would be due when plaintiff in error received his contract, the second payment of $2800 would be due in one year and the third payment of $2800 in two years; that these terms were advantageous because the returns would very

likely meet all of the second payment, and would, in his estimation, meet part of the first deferred payment; that the Campbell Investment Company would receive no profit until plaintiff in error had received his money back, with six per cent interest, and then the proceeds would be divided equally between plaintiff in error and defendants in error; that the property was worth all that defendants in error were asking for it; that the improvements that were being made and that were contemplated by defendants in error would make these lots sell very quickly and would bring plaintiff in error a good profit; that defendants in error were to put in a lake and build a driveway around it, improve the streets, put in sidewalks, build two islands in the lake, build a tower on one of the islands, build a foot-bridge from one of the islands to both shores, put in water and sewer and build a dam. Bouton, produced as a witness before the master by plaintiff in error, testified that these improvements were never made, and that the only improvements on the property sold to plaintiff in error were streets marked out, plowed on the sides but not graded. Plaintiff in error told Bouton that he would accept the proposition and gave Bouton a check for $500 to close the bargain. On March 10, 1902, plaintiff in error wrote defendants in error advising them that he had accepted the proposition for the sale of the seven and one-half acres; that he had given Bouton a check for $500, and inclosed another check for the same amount and his note for $1800 due April 8, 1902, all representing the first payment. The letter then continued as follows: "In going into this deal I have assumed the greatest financial risk of my life, and only do it because of my confidence in your integrity and business judgment, and I sincerely trust that my confidence has not been misplaced. You will send me the proper papers, I presume, and I shall make every effort to carry out my part of the agreement to the letter. I would ask, however, that I be given the op-

portunity of placing some of the advertising matter when it is ready."

Under date of March 10, 1902, Theodore P. Shonts and wife, for an expressed consideration of $10,500, conveyed to plaintiff in error, by warranty deed, block 37, except lot 12, and lots 1, 2 and 4 to 22, inclusive, in block 38, in Minnick's Oaklawn subdivision. This deed was acknowledged May 23, 1902, and was filed for record by the defendants in error in the recorder's office of Cook county on May 25, 1902. On March 18, 1902, defendants in error sent plaintiff in error for execution by him a warranty deed which they had prepared, conveying the two lots owned by plaintiff in error in Beverly Hills to Theodore P. Shonts. Plaintiff in error executed the deed and returned it to defendants in error, the letter accompanying the deed from defendants in error advising plaintiff in error that it would be necessary for him to execute a trust deed securing the deferred payments before a deed could be delivered to him for the seven and one-half acres, and that "we will attend to this as well as all other matters." Thereafter, on November 14, 1903, Shonts conveyed the Beverly Hills lots, by quit-claim deed, to defendant in error John A. Campbell.

On March 24, 1902, plaintiff in error wrote defendants in error asking whether there would be any discount upon the deferred payments if he paid cash. On March 26, 1902, defendants in error replied that they had "labored with our man to get him to accept the payments;" that they would "see him again" and try to persuade him to accept the cash if plaintiff in error cared to pay the notes before they were due, but they were positive that "he would not make any reduction for cash." On the following day, March 27, defendants in error, through C. P. Campbell, again wrote the plaintiff in error as follows: "I have seen the owner of your notes and have told him that we thought you could take them all up providing he would give you a discount of two and one-half per cent. He replied that five per cent

275 — 20

money was good to him and that he would not give any discount. I had a long conference with him, and the result of the whole conference was to rebate you the interest from March 8 if taken up by the 8th of next month. My advice, Mr. Voorhees, would be for you to do this on account of the extra expense you will be at to the releasing of lots, and it will enable you to make transfers much more rapidly."

On April 2, 1902, defendants in error sent a letter to plaintiff in error concerning the immediate payment of the two notes for $2800 each in accordance with the proposal contained in their letter of March 27, and stating, "We would recommend this." Plaintiff in error did not avail himself of the opportunity given him to pay cash for the seven and one-half acres, and some time during the month of April defendants in error sent him for execution two notes for $2800 each, dated March 10, 1902, and due in one and two years, respectively, and a trust deed securing these notes. Both notes were payable to "myself," and Charles P. Campbell was named as trustee in the trust deed securing the notes. Defendants in error directed plaintiff in error to indorse each of the notes, and to return the notes and trust deed, when executed, to them. Upon receiving the notes and trust deed plaintiff in error wrote defendants in error in part as follows: "I notice in the deed that one lot is excepted in each block, and this I do not understand, as I have your word that the whole of one block (37) and one-half of the other (38) were included in the purchase. I presume there is a good reason for this but think it wise to ask the reason. In the matter of the notes, I presume it is correct to have them made out to myself, but the reason does not at once appear. Will you please explain." In reply, under date of April 28, 1902, defendants in error wrote: "Your question is the most natural one in the world, but if you will refer to my letter of January 20th, in which I submitted the proposition to you originally, you

will find this paragraph: 'Now, you will find that I said that the seven and one-half acres would subdivide into sixty-three lots,' and if you will count the number of lots mentioned in the deed you will find there are sixty-three. Mr. Shonts never owned the lots mentioned in the deed as being excepted. Second, as to the notes, they are made payable to yourself, and by you indorsed, because that is customary in all papers of this character. It does not make a particle of difference to Mr. Shonts and it never occurred to us that it would raise any question in your mind. * * * Up to now we are acting as your and Mr. Shonts' agent, and after this transaction is closed we will prepare an agreement between you and ourselves to re-handle the property on the basis proposed at the time of the beginning of these negotiations."

On May 9, 1902, plaintiff in error sent defendants in error a list of thirteen names of persons to whom literature might be sent concerning the re-sale of the lots purchased by plaintiff in error.

On May 12, 1902, defendants in error, through C. P. Campbell, acknowledged the receipt of the trust deed, and stated: "The owner of the seven and one-half acres is out of the city but is expected here this week. When he returns we will have him execute your deed and we will have it recorded and then forwarded to you. We received a letter from him just the other day in which he said that he might have to raise some additional money shortly, and wanted to know if we could not negotiate a loan for him on your notes. We think that now would be a good time, Mr. Voorhees, to strike him for a discount on these notes, and if you can possibly see your way clear to pay them by the 18th or 20th of this month I would advise you to make him an offer of a discount of two per cent. I do not know whether it would go through or not." On May 17, 1902, plaintiff in error wrote that he could not pay the notes in full but inquired whether he could pay $1000 on the notes.

In the meantime the note of $1800 given as part of the first payment had been paid. Under date of May 20, 1902, defendants in error, through C. P. Campbell, acknowledged receipt of the letter of May 17, and stated: "I immediately went to the owner of your notes regarding your proposition. * * * He said that he must have $2500. If he could get that much now, he would stand the discount of two and one-half per cent. * * * I would strongly advise you to make an extra effort to raise the additional $1500 and report to me at once." On June 2, 1902, plaintiff in error sent defendants in error $1500 to apply on his notes, and on June 26, 1902, defendants in error sent plaintiff in error a contract executed by them for the re-sale of the lots by them, this contract being in accordance with the agreement which they had made with plaintiff in error concerning the re-sale of the lots when he purchased them. On July 8, 1902, defendants in error sent plaintiff in error the deed from Shonts to him for the seven and one-half acres, the same having been duly recorded in Cook county. On January 26, 1903, defendants in error wrote plaintiff in error that they had sold eight or ten of the lots on the installment plan—$10 cash and $5 per month. Shortly after March 10, 1903, plaintiff in error sent defendants in error the balance due on the first note for $2800. On March 18, 1903, defendants in error acknowledged receipt of the balance on the first note, and stated: "The owner of your note is out of the city, but we have turned the matter over to his agent and expect to get your note from him in a few days and we will forward it to you just as soon as we receive it." A number of letters then passed between the parties, those from plaintiff in error inquiring about the prospects of sales, and those from defendants in error assuring him that the prospects were excellent and giving him various reasons for their belief that they would soon be able to dispose of the lots.

After several requests for a statement of the proceeds received from the sale of lots, plaintiff in error was on February 27, 1904, advised that there was a credit of $358.93 on hand which was being retained as a contingent fund for the payment of taxes and other necessary expenses, and was notified concerning the $2800 note which matured on March 10, 1904: "We are advised to-day by the bank that the owner has placed same with them for collection, and they notified us that it is payable at our office." In answer to a demand made upon them by plaintiff in error for immediate information concerning the number of lots sold and the prices at which the same had been sold, defendants in error on March 3, 1904, sent plaintiff in error a statement showing that eight lots had been sold at the uniform price of $275 per lot, and that none of the remaining lots had been sold. Plaintiff in error paid the remaining note in full on March 10, 1904. This note, as well as the other note for $2800, when returned to plaintiff in error, contained only the indorsement of plaintiff in error and was stamped paid on the face thereof by the Campbell Investment Company.

Theodore P. Shonts, whose deposition was taken by the plaintiff in error, testified that his only connection with the property sold to plaintiff in error by the Campbell Investment Company was, that this property, together with other real estate owned by defendants in error, was conveyed to him as security for a line of credit which he arranged with a Chicago bank to extend to defendants in error; that he had no negotiations concerning the sale of the seven and one-half acres to plaintiff in error and that he had no recollection of being asked to discount notes; that he never sold any of the property deeded to him by defendants in error but that he executed a number of deeds to various persons at the request of defendants in error; that he never received any of the proceeds of sale from any of this property but understood they were applied upon the indebted-

ness to the bank, and that when the bank advised him that the indebtedness had been paid by defendants in error he deeded all unsold property back to defendant in error David C. Campbell.

Other letters followed between plaintiff in error and defendants in error, those from plaintiff in error inquiring concerning sales and the prospects of sales and complaining because of the failure of defendants in error to reply to his letters and to furnish him with reports, and those from the defendants in error consisting of statements concerning the bright prospects for sales and the constantly increasing value of the property. A letter written by plaintiff in error to John A. Campbell on January 9, 1906, shows the situation then existing. It was as follows: "On July 21, 1905, you wrote me at length respecting my Oaklawn property, though usually your brother, C. P. Campbell, has had charge of the correspondence. Of late, however, I have been unable to secure a reply to my communications. His last letter was dated July 24 last, and in it he acknowledged my right to a part of cash in your hands remaining to my credit. I have written him on the following dates: Aug. 21, Sept. 6, Sept. 28, Oct. 25, Nov. 6, Nov. 16 and Dec. 14, only one of which received any notice, and that was a promise to write at length on his return from a business trip to Pittsburg. I am sure you will agree that this is not business, and if you were in the place of a client you would feel keenly the neglect. I have trusted your firm absolutely in the matter of a large investment and have your repeated promise to look after my interests. This you may be doing, and I still trust you are, but such neglect is not likely to stimulate confidence. You will understand that I would not have written so frequent if my first letters had been answered. I now appeal to you for courteous treatment, which you, in your letter above referred to, assured me it was natural to expect. May I not hear from you at once

and receive the remittance which I asked and which has been acknowledged to be properly due?"

The remittance referred to was $150 of the amount shown by defendants in error's statement as net proceeds from the sale of lots belonging to plaintiff in error. Not having received any reply to his letter of January 9, plaintiff in error on February 15, 1906, again wrote defendants in error, referring to the fact that no response had been made to his former letter, and stating: "Unless a reply is received I shall feel justified in concluding that you are not particular to retain the good will of your clients. Let me assure you that I am anxious not to be compelled to accept such a conclusion. As I have said, I have trusted you and am anxious to know that my trust has not been misplaced. If you do not want to be worthy of my confidence, please tell me so at once, that I may seek someone else to look after my interests."

On March 16, 1906, defendants in error sent plaintiff in error a statement showing $315.52 cash on hand due plaintiff in error and notes on hand from the sale of lots amounting to $1315. Plaintiff in error then went to Chicago and consulted Judge Cleland about the matter. He testified that he told Judge Cleland the full story but received no advice at that time; that after his return home Judge Cleland wrote him a letter informing him that Charles P. Campbell, and not Theodore P. Shonts, was the holder of the record title at the time the conveyance was made by Shonts to plaintiff in error and that Campbell had purchased the property at a sheriff's sale. Plaintiff in error, after consulting Judge Cleland but before receiving the above mentioned information from him, called upon the defendants in error at their office, then meeting them for the first time. He called their attention to the fact that they had failed to answer his letters, inquired about the condition of the property and asked to be informed why more lots had not been sold. Defendants in error stated that the

times had not been as brisk as they had hoped for and on that account sales had not been made, but assured plaintiff in error that everything was all right. An arrangement was then made for plaintiff in error to visit the property with an office boy, which he did the following day. Later, and before returning to his home in New Jersey, plaintiff in error had a conversation with Charles P. Campbell, in which plaintiff in error told Campbell that he was obliged to borrow the money with which he purchased the seven and one-half acres and was anxious to re-pay it out of the sales of lots, and that as their compensation depended upon the division of the profits after the purchase price had been returned, he looked to them to be vigorous in their efforts to secure sales and make the deal a success. Campbell replied that they had made a good profit when they sold to plaintiff in error. Plaintiff in error testified that he was very much surprised at this remark but does not recall what reply he made. Campbell made excuses for not sending money to plaintiff in error and promised that he would send him $200 immediately upon his return to New Jersey. Plaintiff in error then returned to his home in New Jersey, and on April 6, 1906, wrote defendants in error that since his return home he had been expecting the promised draft for $200 and was surprised that it had not been sent. Defendants in error failed to reply to this letter, and plaintiff in error again wrote them on April 24, and failing to receive any reply again wrote them on May 24, 1906. On May 26, 1906, defendants in error sent plaintiff in error $150. Other letters were then written by plaintiff in error requesting definite information concerning his lots, but he received no reply until April 1, 1907, when defendants in error sent him $300, informing him that it had just been paid in by Edwin J. Lewis, the purchaser of two of the lots, and that Lewis was now entitled to a deed. A blank deed to Lewis was inclosed and plaintiff in error was requested to execute the deed and return it to defendants in

error at once. Plaintiff in error having failed to answer the letter of April 1 or to return the deed, defendants in error on April 9 again wrote him concerning the immediate execution and return of the deed. Upon receipt of the letter of April 1 plaintiff in error consulted his cousin, Foster M. Voorhees, a practicing attorney of New Jersey, and on April 12, 1907, wrote defendants in error that he had referred the matter of the execution of the deed to his attorney, who would write them concerning the matter within a few days. About this time plaintiff in error learned that Theodore P. Shonts, who had conveyed the lots to him, was a resident of New York City, and Foster M. Voorhees wrote Shonts concerning the matter, charging that misrepresentations had been made to plaintiff in error by defendants in error. Shonts forwarded this letter to defendants in error and was advised by them that they had written Voorhees denying that misrepresentations of any kind had been made to plaintiff in error.

On April 26, 1907, Foster M. Voorhees wrote defendants in error, stating that plaintiff in error had submitted to him their letter relative to the execution and return of a deed to Lewis; that an investigation of the matter had led the writer to believe that there were certain misrepresentations made at the time plaintiff in error was induced to purchase the lands, and that the writer had advised plaintiff in error to defer sending the deed and accepting the check for $300 until such time as the writer could satisfy himself that the transaction was fair and proper; that if defendants in error were willing that the plaintiff in error should accept the check and execute the deed without prejudice to his rights, the writer would advise him to do so. In reply to this letter defendants in error on May 2, 1907, wrote Foster M. Voorhees expressing surprise at the suggestion that plaintiff in error was induced to buy the property through false representations, and stating: "We deny this emphatically, and the suggestion hardly comes from

Mr. Voorhees at this time in good grace. Mr. Voorhees purchased in 1902 seven and one-half acres of land and paid for the same. We are handling his acres for him and have sold from time to time lots therefrom and have made accounting to Mr. Voorhees and sent him money which he has accepted. Up to the present time we have never had any intimation from Mr. Voorhees that he did not desire us to handle these acres for him, but, however, if he does not care to have us act any longer in the way of handling this property we shall be pleased to have him so write us. Our only interest in the matter is to secure for him as good price for the lots we are handling for him as possible. We shall be pleased to have him execute the deed submitted to him without further delay, believing that it is to his interest to make the sale of these two lots at the price mentioned. The spring activity is beginning and there ought to be a demand now for his lots."

In June, 1907, plaintiff in error again went to Chicago and called upon defendants in error. His conversation was with C. P. Campbell. He told Campbell that he had been disappointed in the outcome of the deal and in certain things that he had learned concerning it; that he had learned that at the time of the sale Shonts was not the owner of the property; that he had had a conversation with Shonts in New York, in which he told plaintiff in error that his only connection with the property was that of backing the Campbell Investment Company in securing a loan on the property, and the plaintiff in error told Campbell that this was something that was not right and asked for an explanation. Campbell replied that he did not know what Shonts had told plaintiff in error, but that so far as the transaction was concerned it was all right; that he expected to see Shonts during the summer. Plaintiff in error also complained about the failure of defendants in error to answer his letters and to make reports of the sales made and the prospects of future sales; that the agreement between the

plaintiff in error and defendants in error for re-sale of the lots by defendants in error had expired March 1, 1907; that no new agreement had been made and that plaintiff in error was dissatisfied with the situation. Plaintiff in error asked Campbell what explanation he had to make concerning these matters. Campbell offered to make another agreement for the handling of the property by defendants in error and to insert in the new agreement a provision requiring them to make regular reports. Plaintiff in error further told Campbell that he would like to have the discrepancy between his statement and the statement made by Shonts cleared up, and until it was he would not have the same confidence in defendants in error that he had had. He referred to the remark made by Campbell in 1906 with reference to making a good thing when they sold to him, and Campbell said that he had only meant that he had made a commission at that time on the sale to plaintiff in error.

After his return home, and in July, 1907, plaintiff in error executed the deed which had been sent him by defendants in error conveying two of the lots in block 37 to E. J. Lewis and sent the deed to defendants in error. This deed, and a deed made by plaintiff in error to John P. Gulick in July, 1902, for one of the lots sold by defendants in error, were the only conveyances made by plaintiff in error of any of the lots in controversy. Defendants in error prepared the new agreement for re-sale of the lots by them in accordance with their promise to plaintiff in error while he was in Chicago in June, 1907, and sent it to plaintiff in error. The latter, however, refused to sign the same and it was never executed.

At the request of plaintiff in error, defendants in error on November 14, 1907, sent him a report of receipts and disbursements from June 12, 1902, to August 1, 1907, showing sales of eight lots and cash received therefrom, amounting to $1381.68; also showing that defendants in error had retained therefrom $262 on account of various

expenses incurred in connection with the sales of lots, including $220 for commissions on sales; that they had paid taxes amounting to $318.80; that they had paid interest amounting to $280 on one of the notes given by plaintiff in error when he purchased the property; that they had paid plaintiff in error $450, and that there was a balance of $70.88 cash on hand.

Under date of December 20, 1907, Theodore P. Shonts wrote defendants in error that plaintiff in error had again called at his office on December 16; that during May, 1907, Shonts had received a communication from Foster M. Voorhees, which he had forwarded to defendants in error, and was advised by defendants in error that they had written Voorhees denying that misrepresentations of any kind had been made to plaintiff in error. The letter then stated: "As you are aware, the only interest I have had in this or any other real estate transaction of the Campbell Investment Company has been the deeding to me of its real estate as a protection to the line of credit which I gave the Campbell Investment Company through the American Trust and Savings Bank of Chicago. I have never had any information of any kind relative to the Campbell Investment Company's real estate transactions, my only interest being to see that the proceeds of the lands sold were applied to the liquidation of the company's indebtedness at the bank. I therefore could throw no light upon the situation when Mr. Voorhees called last spring, nor can I now, except to transmit any information you may give me. I wish to say, however, that if there has been any misunderstanding on the part of Mr. Voorhees or anyone else due to a misapprehension of my relationship to this or any other real estate deals the same must be straightened out." Shonts sent a copy of this letter to plaintiff in error. On December 23, 1907, defendants in error replied to the letter from Shonts, giving Shonts a statement of what had transpired between them and plaintiff in error during 1907,

and stating: "We beg to assure you that it is our judgment that there has been no misunderstanding on the part of Mr. Voorhees due to any misapprehension of your relationship in this real estate deal, and it seems to us that Mr. Voorhees is simply using your relationship in the matter arising out of the fact that title was in your name of record, in the hope of securing an unfair result thereby through your influence, which he is not entitled to."

On January 4, 1908, plaintiff in error wrote to defendants in error referring to the letter from Shonts to defendants in error, a copy of which had been sent by Shonts to plaintiff in error, and then continuing: "It seems to me, however, in view of the statement of Mr. Shonts, that you owe me an explanation of the facts stated in the paragraph. I called your attention last June to certain discrepancies between your statement and Mr. Shonts' remarks and requested an explanation. * * * In view of the statement in the latter part of his letter to you of December 20, 1907, it seems to me I am justified in expecting some reply in explanation. Judge Cleland's statement [that Shonts did not have title to the property when plaintiff in error purchased the same] either is or is not true. If it is not, it is to your interest to make that fact clear. If it is true, it is to my interest to use the utmost care in determining my future action."

Under date of January 9, 1908, defendants in error wrote plaintiff in error, stating that in reply to the letter from Shonts, a copy of which was sent plaintiff in error, "we advised Mr. Shonts in detail of the efforts we have been making to satisfy you in the matter and of our inability to secure any definite reply from you to our communications. * * * We do not yet understand in what way you find any discrepancy between our statement of the facts as they exist and the facts as indicated by Mr. Shonts to you in his letter to us. * * * When we made the sale of this property to you it became necessary for us to deal

with Mr. Shonts. He held the title to the property to se-
cure him on account of a certain line of credit made to us
through his instrumentality and had the sole right to deter-
mine whether or not he would make sale of said property
upon terms and conditions submitted to him by us. Before
a deed could be made for this property or any portion of
it could be sold it became necessary to consult Mr. Shonts
and secure his consent to the transfer upon terms and con-
ditions agreed upon with you. In all of our negotiations
with you we did take the position that we had to deal with
a third party, and such has been the fact."

Plaintiff in error replied to the foregoing letter on Janu-
ary 14, 1908, calling attention to the discrepancies between
the statements made by defendants in error and the state-
ment made by Shonts regarding the connection of the lat-
ter with the property sold to plaintiff in error, and stating:
"It seems to me that I am entirely justified in asking a
full explanation. I entrusted with you five years ago a
large investment, the outcome of which, to say the least, has
been unsatisfactory and not at all in accordance with your
confident predictions. Nevertheless, I trusted you until you
abused that trust by refusing to answer my letters and by
apparently taking no interest in the outcome of that invest-
ment. Now it seems to me I must be more fully assured
of your purposes and intentions. * * * Since the future
is so linked with the past I feel justified in asking an ex-
planation of those matters that seem on the surface so
contradictory. If they can be explained satisfactorily my
course is clear. You are in a position to make the explana-
tion and I shall be glad to receive it."

On January 27, 1908, defendants in error wrote plain-
tiff in error in answer to his letter of the 14th: "We still
fail to find any discrepancy in any vital respect with the
correspondence. In dealing with you in 1902 we never rep-
resented Mr. Shonts as having anything to do with the sale,
Mr. Shonts' name was not mentioned in the negotiation.

We indicated to you at the time the deal was made that we had to deal with a third party, and this was a fact. Mr. Shonts had the interest heretofore explained to you in the real estate. No fuller explanation is possible than we have already made you. * * * We believe that it is in our power to prove to you by actual results that your investment will turn out to your profit and advantage. It may take, and we believe it will take, time and a certain degree of patience. So long as we are kept in a defensive attitude by your legal adviser we cannot do much to help the present situation."

Plaintiff in error replied to this letter on February 18, 1908, stating among other things: "My complaint has been that you did not use your best efforts during the last five years. * * * It is not my legal adviser that has put you on the defensive but your own indifference to my interests. Your unbusinesslike treatment of me has been such as to make me act with caution, and this, coupled with the statement that you were compelled to refund in similar cases where judgments were secured, has led me to make the investigations in which I have been engaged. As a result of them I am confirmed in the opinion that I was willfully and purposely deceived at the outset. You did not tell the truth, as you have practically admitted. There was no third party other than Mr. Shonts, as your letter of April 28, 1902, plainly indicates. * * * At the time of the sale I understood, and you intended me to understand, that the desire for profits would lead you to put forth your best efforts to secure sales. In your letter of March 1, 1902, you said: 'You are to receive your money back, with six per cent interest on the same, before we, as a company handling your property, get anything for our time and trouble. In other words, our remuneration comes after you have gotten your money back, with six per cent interest.' Now I know that you received the money for the property and not Mr. Shonts, * * * and paid your own debts with

it. That is, you did receive profits and were not dependent upon the successful issue of the transaction for profits, hence it was a matter of indifference to you whether my interests were cared for or not. You recall your own statement to me made in March, 1906: 'Of course we made a good thing when we sold to you.' When I spoke to you of this statement at our interview last June you did not deny having made it but stated that you only referred to the commission you then received. Now we know that you received no commission whatever, for Mr. Shonts was only interested in seeing that you paid your own debts with the proceeds. I am forced to the conclusion that you made statements to me that were not true in order to induce me to purchase the property. These statements you knew to be false. Had I known the truth I would not have considered the proposition for a day. * * * With these facts before you I cannot see how you can say there is no discrepancy between the facts and the correspondence. The discrepancy is in matters vital morally, and, I believe, legally. You were represented to me as a christian gentleman, and I expected common christian honesty in the matter. * * * If you do not show me that I am in error I shall take it as a confession on your part that the deception under which I lay at the time of the purchase was deliberate and intentional. If you can show me that I am in error I shall be as glad to retract as I feel you should be if you were in the wrong. * * * In our interview last June I presented all these matters and said I believed you owed it to me to clear up the subject so as to remove my feeling of distrust. Mr. Shonts asked that you do the same, but as yet you have failed. Every bit of information that has come has increased, instead of diminished, my feeling of distrust, but I give you the fullest opportunity to make the matter right."

On February 28, 1908, the defendants in error acknowledged the receipt of the foregoing letter and wrote, in part, as follows: "We are frank to say that we deem it subserves

no purpose or good whatsoever to continue correspondence upon the subject matters discussed again in your communication of February 18. Such continuation will simply prolong a controversy which is exceedingly disagreeable, as we feel, to both you and ourselves. If you feel that we have been in the wrong, all that we can do will be to endeavor to convince you that you are mistaken by our future conduct in connection with the handling of your real estate, if you permit us to handle it. We feel also that the more quickly we are permitted to undertake the matter, if at all, the more quickly do we hope to be able to satisfy you that you have misjudged us in your various communications." This letter, together with some of the other foregoing letters from defendants in error, was written in connection with their request to plaintiff in error to execute the new agreement for re-handling the property, which they had sent him for execution soon after his last visit to Chicago.

On March 21, 1908, plaintiff in error wrote defendants in error as follows: "Your unwillingness to defend yourselves under the circumstances seems conclusive evidence that the statements of my previous letter were true. I state again that at the time of the sale I did not know the truth and could not have known it from your statements. You have not made good and I cannot see how it is possible to do so now. As you know, on or about about November 17, 1906, F. M. Voorhees, of Elizabeth, wrote you suggesting a method of settlement,—the return to you of the property at the price paid, with interest, I, of course, accounting to you for all moneys received. This proposition was renewed in the correspondence with Mr. Shonts, and I now make it again as a way by which you may resolve the situation without injury to yourselves, and, indeed, with entire credit, and by which also you may prove to your own satisfaction that your promises of a satisfactory termination of the transaction by favorable sale of the lots was within the bounds of reason. I will give you as long to

275 – 21

pay for the same as I was given, namely, two years." Having received no reply to his letter of March 21, plaintiff in error, on April 16, 1908, again wrote defendants in error requesting an answer to the proposition contained in his former letter, and stating: "I have waited with the utmost patience and now feel that patience is no longer a virtue. You know my reluctance to use other than peaceable means to secure my rights. I trust still that no other means will be necessary, but the decision must rest with you."

In May, 1908, plaintiff in error sent the following telegram to defendants in error: "Do not allow taxes to become delinquent." Defendants in error replied on May 18, 1908, that, acting under the instructions contained in the foregoing telegram, they had paid the taxes on the property of plaintiff in error and had charged the same to his account. The bill herein, as hereinbefore stated, was filed July 8, 1908. After the bill was filed plaintiff in error continued to pay the taxes upon the property here involved, such payments extending up to the time of the entry of the decree, on November 15, 1915.

Charles P. Campbell was the only one of the defendants in error testifying in the case. He testified that along in January and during the spring of 1902 the real estate market in the vicinity of Oaklawn was active; that the Stickney transfer yards were located near there about that time and were being developed and a number of houses had been built in Oaklawn; that the train service between Oaklawn and Chicago was good, and that a station was located about three blocks from the property sold to plaintiff in error; that subsequently the Stickney transfer yards "all went to pieces,"—that is, no development was made,—and the railroad decreased its train service between Oaklawn and Chicago; that as a result it was impossible to get people interested in the property; that from 1902 to 1904 defendants in error were able to sell a number of lots in that

vicinity without much effort; that subsequent to 1904 they were not able to do very much with the property; that from 1906 to 1908 the market continued to grow worse— the property was depreciating in value; that the values have depreciated very much and that the market for the property is now "practically nil."

It is necessary first to determine the relationship which existed between the parties. It is contended by plaintiff in error that defendants in error acted as his agents throughout the whole transaction and that a fiduciary relationship existed. That such was the relationship between the parties is denied by defendants in error. It does not appear that any such agency existed before plaintiff in error purchased the Beverly Hills lots. He resided at considerable distance from the city of Chicago and was therefore unable to personally look after this property. These lots were vacant and required no particular attention aside from the paying of the taxes. After plaintiff in error purchased the lots defendants in error from year to year notified him of the taxes which were due and attended to the payment for him. That they understood they had the management of this property and the handling of it is evident from the correspondence which began in reference to the Oaklawn property. In the first letter written to plaintiff in error by C. P. Campbell he stated that defendants in error had been thinking for some time of selling or trading his Beverly Hills lots. In making the pretended sale from Shonts of the Oaklawn property defendants in error represented plaintiff in error in the sale of his Beverly Hills lots and put them in at a sum largely in excess of the price he had paid. They correctly summarized the relationship which existed between them and plaintiff in error since the time he purchased the Beverly Hills lots in the letter of April 28, 1902, in which they stated that up to that time they had acted as his agents. That they acted as his agents after the purchase of the Oaklawn property cannot be disputed,

as a written contract of agency was entered into. It clearly appears that plaintiff in error reposed the utmost confidence in defendants in error. This trust and confidence was not only accepted by them but was encouraged and stimulated by every possible means. It cannot be doubted from the facts above set out that the defendants in error were acting throughout as the agents of plaintiff in error, that confidence was reposed in them, and that the trust was accepted by them. Transactions between a party and one bearing a fiduciary relation to him are, upon motion of the dependent party, *prima facie* voidable upon grounds of public policy, and the fiduciary relation being established, the burden of proof is upon the one receiving the benefit to show an absence of undue influence by establishing such facts as will satisfy the court that the dealing was at arm's length, or that the transaction was had in the most perfect good faith and was equitable and just between the parties. (*Thomas* v. *Whitney,* 186 Ill. 225; *Dowie* v. *Driscoll,* 203 id. 480; *Fish* v. *Fish,* 235 id. 396; *Beach* v. *Wilton,* 244 id. 413.) The facts proven disclose that defendants in error, after encouraging plaintiff in error to repose his trust and confidence in them, betrayed that confidence and took an unconscionable advantage of him. The deception practiced began at the very inception of the correspondence relative to the purchase of the Oaklawn property. This property was falsely represented as belonging to a third party, whereas, in fact, it was owned by the Campbells and had been purchased by them for a comparatively small sum. In order more easily to induce plaintiff in error to become interested in the proposition it was proposed at the outset to trade his Beverly Hills lots in at such a sum as would net him a considerable profit. Throughout the correspondence defendants in error continually made suggestions to him as to concessions which they might secure for him from the alleged owner of the Oaklawn property, recommending that he make proposals along the lines suggested and offering to

use their influence with the alleged owner of the property to secure such concessions. Defendants in error not only deceived the plaintiff in error as to the ownership of the Oaklawn property, but the value of these lots was grossly misrepresented to him. They were apparently in straitened financial circumstances at the time and used this means of securing money to pay off their indebtedness. Defendants in error failed to show that the dealing between the parties was at arm's length or that the transaction was beneficial to plaintiff in error.

It is insisted, however, that the cause of action is barred by the *laches* of plaintiff in error. Where a cause of action arises from fraud, *laches* will not apply in equity until the discovery of the fraud or until the fraud could have been discovered by the exercise of reasonable diligence. The failure to use diligence is excused where there is a relation of trust and confidence which renders it the duty of the party committing the fraud to disclose the truth to the other. (*Farwell* v. *Great Western Telegraph Co.* 161 Ill. 522; *Penn* v. *Fogler,* 182 id. 76.) There being here a relation of trust and confidence, the duty to exercise reasonable diligence to discover the fraud did not rest upon plaintiff in error, and it does not appear that he was in possession of all the facts relative to the fraud which had been practiced upon him until the institution of this suit.

It is contended that plaintiff in error knew all the facts and all the circumstances more than two years before the beginning of the suit and that he is now estopped by the affirmance of the transaction. He did learn in 1907 that Shonts simply held the title to this and other property to secure himself against liability he had incurred to assist defendants in error in the conduct of their business and that the property was actually owned by one of the defendants in error. He immediately brought to the attention of defendants in error all that he had learned in this connection. They did not attempt then to put him in possession of all

the facts, but by every means at their command sought to mollify him and to convince him that the investment was a good one and that he would ultimately receive the profits which had been originally promised him. While it is true that he made a visit to Chicago and inspected the property, he knew nothing of its value except from the information which he secured from defendants in error. Although they now show that the property has no market value and that it has been constantly depreciating in value since 1904, in their correspondence with plaintiff in error up until the time the suit was instituted they represented the property as increasing in value and held out to him glowing prospects of the great returns which would be ultimately realized from its sale. Plaintiff in error did not discover the fraud practiced upon him until the filing of this bill, and he therefore cannot be held to have ratified or affirmed the transaction. It is only when the influence under which the transaction was had has entirely ceased that a party may elect to affirm the acts done. *Rickman* v. *Meier,* 213 Ill. 507.

In connection with the contention that plaintiff in error is estopped by reason of his affirmance of the transaction, defendants in error rely upon the facts that he executed the deed to the lot sold to Lewis in July, 1907; that in April and May, 1906, after his interview with the Campbells, he demanded money on account, and thereafter accepted $150 sent him May 26, 1906, $300 sent him April 1, 1907, and $37 sent him on another occasion; that he demanded statements of account as late as August 26, 1907, and December 4, 1907; that he promised to sign a new agency contract prepared in June, 1907, and that he paid taxes on the property in May, 1908, and also subsequent to the filing of the bill. For the reasons given, the acts relied upon which were performed before the filing of the bill could not be held to be an affirmance, as plaintiff in error was not in possession of all the facts. In any event, he was bound to make the conveyance to Lewis, who had contracted for the

property and had paid the full purchase price.   After plaintiff in error received the title to the Oaklawn property it was his duty to pay the taxes on it.   Had he failed to do this he would not be in a position to restore to defendants in error the property as he had received it.   (*Cunningham* v. *Fithian,* 2 Gilm. 650.)   That material misrepresentations were made to plaintiff in error and that he has been damaged by reason of his transactions with defendants in error is apparent from a mere statement of the case.

It is contended that as the contract has been fully executed for fourteen years, the parties cannot be restored to the position originally occupied by them.   It does not appear that there has been any change in the condition of the Beverly Hills lots.   Some of the lots of the Oaklawn property have been sold.   The sales were all made by defendants in error, and they cannot complain that they were not made at an adequate price.   By his bill plaintiff in error offers to account for all moneys he has received upon account of these sales.   Upon the sale of these lots the purchase price took the place of the lots themselves, and plaintiff in error is offering to do all that is required of him when he offers to return the money he received on account of such sales.   When a party discovers that fraud has been practiced upon him in making a contract he should tender what he received under the contract as a condition to its rescission.   (*Mitchell* v. *Mitchell,* 263 Ill. 165.)   This the plaintiff in error has done, and he is entitled to a rescission of his contract with defendants in error, to a re-conveyance of his Beverly Hills lots and to a re-payment of the money which he paid to defendants in error, less the amounts received by him upon the sale of the Oaklawn lots.

For the reasons indicated, the decree of the circuit court is reversed and the cause is remanded, with directions to enter a decree in accordance with the prayer of the bill.

*Reversed and remanded, with directions.*