(Nos. 28984-28985.—

JAMES WILSON WINGER *et al.*, Appellees, *vs.* CHICAGO CITY
BANK AND TRUST COMPANY *et al.*—(GEORGE B. PILLS-
BURY, Admr., *et al.*, Appellants.)

*Opinion filed May 21, 1946.*

VOGEL & BUNGE, and CASSELS, POTTER & BENTLEY, both of Chicago, and A. M. FITZGERALD, of Springfield, for appellant George B. Pillsbury, Admr.; JOHN S. LEAHY, of St. Louis, Mo., and W. T. DAY, of Springfield, (JOSEPH B. FLEMING, and THOMAS B. MARTINEAU, both of Chicago, of counsel,) for appellants Helen Z. Martin et al.

VERNON R. LOUCKS, and MALCOLM R. McKERCHAR, (CHARLES O. LOUCKS, RICHARD W. PROCTOR, and JAMES L. HENRY, of counsel,) all of Chicago, for appellees James Wilson Winger et al.

C. J. BASSLER, WILLIAM S. KLEINMAN, and MAXFIELD WEISBROD, all of Chicago, for appellees Ella Krupicka et al.

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, (EDWARD R. JOHNSTON, of counsel,) both of Chicago, for appellee Illinois Bankers Life Assurance Company.

Mr. JUSTICE GUNN delivered the opinion of the court:

On February 2, 1942, a complaint was filed in the circuit court of Cook county on behalf of policyholders of the Illinois Bankers Life Association, for themselves and in behalf of other policyholders like situated, against the administrator and heirs of Hugh T. Martin, deceased, and others. Later an amended complaint was filed, and thereafter a supplement, making additional parties. A number of other policyholders of the company intervened, and the Illinois Bankers Life Assurance Company, made a party to said suit, filed a cross complaint.

The Illinois Bankers Life Association was organized as an assessment life insurance company, and will hereafter

be called the "assessment company." The Illinois Bankers Life Assurance Company is a legal reserve life insurance company, and will hereafter be referred to as the "insurance company." The purpose of the suit, as disclosed by the pleadings, is to require the directors of the original assessment company, or their administrators, or heirs, to account, because while acting as such directors they purchased the assets and property of such assessment company for their own benefit by having it transferred to the insurance company, in which they own all of the capital stock. The complaint asserts their actions were such as to raise a constructive trust in all of the property acquired from the assessment company in favor of such company or its policyholders, and prays a decree of court requiring such capital stock to be turned over to the assessment company, and for an accounting of all moneys or profits received by such defendants. No relief was prayed against the insurance company, and apparently it was made a party for the purpose of aiding the court in administering relief by requiring its officers to transfer the stock in case they were decreed to do so. The legal representatives and heirs of each deceased director were made parties because the capital stock of the insurance company was a part of the respective estates; and certain purchasers of stock in the insurance company, parties claimed not to be *bona fide,* were made parties to require them to transfer after the accounting had been awarded.

The insurance company filed a cross complaint alleging that the causes of action for the conversion of money belonged to it as the assignee of all of the assets of the assessment company. We will not at this time attempt to make an historical statement of all of the facts, as they fully appear in the opinion of the Appellate Court, reported in 325 Ill. App. 459. As occasion arises to apply the principles applicable to the several parties, recourse will be had to the facts found by the Appellate Court.

The decree of the circuit court of Cook county required Helen Z. Martin, as administratrix of the estate of Hugh T. Martin, deceased, to account, and impressed a trust upon the stock owned by said estate, presently held by the Chicago City Bank and Trust Company, as trustee, for purposes hereafter disclosed; and also decreed an accounting against George B. Pillsbury, as administrator of the estate of Arthur T. Sawyer, deceased, and James D. Stice, purporting to be an innocent purchaser of the major portion of Sawyer's stock; also a decree against William H. Woods to account for the money claimed to have been paid for the purpose of influencing his vote as a director. The Appellate Court in the main affirmed the trial court, but in addition held the plaintiffs had a lien upon the stock held by the two estates; but neither court passed specifically upon the ownership of the stock in the insurance company, under the facts established in the cause.

There are two appeals in this case—that of George B. Pillsbury, as administrator of the estate of Arthur T. Sawyer, deceased, No. 28984; and that of Helen Z. Martin, individually and as administratrix of the estate of Hugh T. Martin, deceased, *et al.*, No. 28985. There was no appeal from the judgment against Woods. After allowing the appeals in both cases they were consolidated in this court for argument.

The first contention made by appellants is that the circuit court had no jurisdiction to entertain the suit in this case because the insurance company was a party, and the Illinois statute on insurance companies vested the right to bring the suit in the Director of Insurance of the State of Illinois through the Attorney General of the State. This motion was urged in the circuit court, and in the briefs filed in the Appellate court, and overruled by both courts. The Insurance Code of 1937 (Ill. Rev. Stat. 1945, chap. 73, pars. 613 to 1064, incl.) is a revision of the insurance law of the State, and makes specific provision for the several

kinds of insurance, the duty of officers and directors, requirements of supervision, and the powers and duties of the Director of Insurance, as well as a minute regulation of the administration of insurance business. It is divided into twenty-eight articles, each of which pertains to a different subject, and in most of which there are express power and duties prescribed for the Director of Insurance. For illustration, section 45 (par. 657,) of article 3 (Domestic Companies,) provides what documents shall be delivered to the Director. Under articles 4, (Reciprocals, par. 683;) 5, (Lloyds, pars. 706 and 714;) 6, (Foreign Companies, pars. 722 and 723;) 9, (General Provisions, . par. 744;) 10, (Merger, par. 774;) 13, (Rehabilitation, Liquidation, etc., par. 800;) 14, (Legal Reserve Insurance, par. 835;) and nearly all of the other articles, including article 24, (par. 1013 *et seq.*) which defines the general powers of the Director, authority is given to, and the duties of the Director over insurance companies are prescribed. It is notable that with all of the different powers, authority and duties prescribed for the Director of Insurance there is now nothing in the act which requires or authorizes the Director to bring a suit for accounting against delinquent officers or directors on behalf of the policyholders, other than might be inferred from the powers granted under article 13, relating to rehabilitation, liquidation, conservation and dissolution of companies. In such cases he is given extensive authority, as may be observed upon examination of sections 187 to 210, inclusive, of this article. Ill. Rev. Stat. 1945, chap. 73, pars. 799 to 822, incl.

Great reliance is placed upon section 201, (par. 813,) which provides: "No order, judgment, or decree enjoining, restraining, or interfering with the prosecution of the business of any company, or for the appointment of a temporary or permanent receiver, rehabilitator, or liquidator of a domestic company, or receiver or conservator of a foreign or alien company, shall be made or granted otherwise

than upon the petition of the Director represented by the Attorney General as provided by this article, * * *." It is contended that the suit brought by the plaintiffs interferes with the prosecution of the business. In determining whether the cause of action is one that can be brought only by the Director of Insurance it must be observed that while the power vested in him is granted under the police power of the State, still, he may not exercise powers not expressly, or by necessary implication, given him by the statute. This section grants powers in connection with the rehabilitation or liquidation of insurance companies. It does not purport to have anything to do with policyholders or stockholders of a solvent company requiring an accounting, or the doing of any act which will not interfere with the business of a solvent and going insurance company. Section 201, just mentioned, before the adoption of the Insurance Code, read: "No order, judgment, or decree providing for an accounting, or enjoining, restraining, or interfering with the prosecution of the business of any domestic insurance corporation," etc. (Ill. Rev. Stat. 1935, chap. 73, par. 105(8a).) It will be noticed in that statute the word "accounting" was present, but is omitted in the revision.

Also great reliance is placed upon the case of *Swan* v. *Mutual Reserve Fund Life Ass'n,* 155 N. Y. 9, 49 N. E. 258, where a policyholder of an assessment life insurance company brought a suit to require it to conform to the stipulations of the policy, and the management of its funds collected from its members. It was held in that case the cause of action was based in the Superintendent of Insurance through the Attorney General. It is interesting to note that the statute of New York, under which this decision was made, was identical with the statute of Illinois as it existed prior to the adoption of the Insurance Code; and an examination of the opinion discloses it was by reason of the law which read: "No order, judgment, or decree providing for an accounting, or enjoining, restrain-

ing, or interfering with the prosecution of the business of any life or casualty insurance company," etc., could be brought except by the Superintendent of Insurance. The action in that case was in substance an accounting suit, but accounting was specifically vested by statute in the Superintendent or Director, as was also the fact in the Federal cases cited by appellant, *Cook* v. *Illinois Bankers Life Ass'n,* 46 Fed. 2d 782, and *Watts* v. *Vanderbilt,* 45 Fed. 2d 968.

Reliance is placed upon the case of *People ex rel. Benefit Ass'n of Railway Employees* v. *Miner,* 387 Ill. 393. The relief in that case was to require a cancellation of an exclusive agency contract authorized by the directors of the company, and to remove all of the directors, and to cause a new election of directors in their place. Such action might be considered as involving conservation of the company, as the removal of all of its directors and leaving it without managing officers for a time at least would be an interference with the business of the company, but specifically the relief asked would constitute an interference because it prayed that certain agency contracts involving all of its business be declared void, when the Insurance Code provided for the approval of agency contracts by the Director of Insurance. (Ill. Rev. Stat. 1945, chap. 73, par. 753.) It necessarily follows that if the statute gave express authority to the Director of Insurance to approve or reject an agency contract it would not be within the province of the court, at the instance of policyholders, to interfere with the prosecution of the business of the company by setting aside a contract wholly within the jurisdiction of the Director of Insurance. This principle was fully sustained in *American Surety Co.* v. *Jones,* 384 Ill. 222, where we held, among other things, that the acts of the Director of Insurance as an executive officer will not be disturbed by the courts, if he acts within his statutory powers.

A fair interpretation of the statute now in effect indicates that accounting of insurance officials to policyholders, at the suit of the latter, is not prohibited by statute in express language, is not granted to the Director of Insurance, and cannot be held to be prohibited by law unless it interferes with the prosecution of the business of the insurance company. As an abstract proposition we cannot see how a suit by a policyholder to require a director to restore money to an insurance company, which he has diverted from its treasury, can interfere with the transaction of its business. The Insurance Code places upon the Director of Insurance certain specific duties enumerated in the different articles of the statute. It does not forbid an accounting at the suit of others, but only prohibits interference. Necessarily, with the vast number of insurance companies under the jurisdiction of the Director of Insurance it could not be reasonably said that he has been given exclusive power over every controversy between the individuals and the directors of the insurance company, but rather that he has certain specific powers and duties, where so stated in the several sections of the act, and also certain general powers, which do not go beyond the general supervision and direction of the administration of the business of insurance, and exclusive powers in case of liquidation or rehabilitation. A statute prohibiting any injunction against any benefit association, except upon application of the Superintendent of Insurance, was held no bar to the right of individual members to bring a suit against the officers of the association, to enjoin acts contrary to the bylaws or articles of the association. (*Bastian* v. *Modern Woodmen of America*, 166 Ill. 595.) While there is some difference between that statute and the one invoked by appellants the similarity of the principle involved makes it persuasive authority against them.

One of the tests of jurisdiction is the relief prayed for in the complaint, or the object of the suit. (*Townsend* v.

*Equitable Life Assurance Society,* 263 Ill. 432.) The prayer for relief was that Martin and Sawyer be decreed to hold the stock of the insurance company in trust for the benefit of the assessment company, and that they be directed and ordered to deliver such shares to the assessment company. This would not constitute interference as we have construed it in *People ex rel. Parkinson* v. *Williams,* 392 Ill. 224, where the same statute was before us in an accounting case involving officers of an insurance company. We think the question of jurisdiction·was properly decided against appellants.

It is claimed there is no basis for the derivative suit upon the part of the policyholders, and consequently nothing upon which to predicate the cross complaint of the insurance company, which contends it is entitled to the sums diverted by the defendants, because it is the owner of the assets of the assessment company. This claim is without merit because even though no right to a class action existed, yet, each one of these individuals bringing this suit made a sufficient showing in his own behalf. They individually had such an interest as would entitle them to an accounting, which in itself would be a sufficient basis to authorize the filing of a cross complaint upon the part of the insurance company. However, we believe this a proper case for a class suit.

In *Hansberry* v. *Lee,* 311 U. S. 32, 85 L. ed. 22, appears a clear definition of what constitutes a class action. It is said: "The class suit was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable. Courts are not infrequently called upon to proceed with causes in which the number of those interested in the litigation is so great as to make difficult or impossible the joinder of all because some are not within the jurisdiction or because their where-

abouts is unknown or where if all were made parties to the suit its continued abatement by the death of some would prevent or unduly delay a decree. In such cases where the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represent the former in the prosecution of the litigation of the issues in which all have a common interest, the court will proceed to a decree."

It requires no extended analysis to disclose that all of the policyholders of the assessment company not joined as plaintiffs are of the same class as those who appeared as plaintiffs, and that the interests of the plaintiffs in this case fairly represent all of the policyholders not actually joined as plaintiffs. The circuit and Appellate Courts properly rejected the motion to dismiss the cross complaint.

It appearing the plaintiffs and intervenors have a right to maintain the suit against the defendants, applicable principles of equity should govern the remedy against them. The substantial facts alleged in the amended complaint show Hugh T. Martin was a director in the assessment company; so, also, were William H. Woods, Arthur T. Sawyer, J. R. Ebersole and R. M. Work. Martin conceived the idea of organizing a legal reserve company. He did take steps, and did organize a legal reserve insurance company under the name of the Illinois Bankers Life Assurance Company, with a capital of $100,000 and a surplus of $50,000. Before the organization of the new company Martin agreed to furnish all the capital and surplus, and to purchase all of the stock of Woods, Ebersole and Work, subscribed for by them, with the understanding they were to remain as officers in the new company. He agreed to pay Woods $100,000 in cash and $60,000 in deferred payments; Ebersole $25,000 cash and $75,000 later; Work $75,000 cash and a note of Work due the bank for $15,000, but Work was to turn over certain real estate, later proved to be of small value. Sawyer was to remain in the com-

pany without cost as a twenty-per-cent stockholder. Woods and Ebersole were to receive increased salaries as officers.

It is alleged the money agreed to be paid Woods, Ebersole and Work was for the assistance they were to give, and for the use of their names in inducing the assessment company to transfer all of its assets to the insurance company, and to accept the reinsurance contract for its policyholders; that these payments were made, the insurance company organized, and the capital stock and surplus paid in; that the assignment of assets and the delivery of the reinsurance contract made and approved by these men, who were all directors of both of the companies, and that a meeting of the policyholders approved the contract, but that 99 per cent of those appearing in person or by proxy at the stockholders meeting were represented and voted by Martin, who was the principal owner of the stock in the new company. These proxies were solicited by letters signed by the secretary of the assessment company, the names of the directors appearing at the top of the letterheads. It is alleged that the recommendation of the entire board of directors induced the policyholders to execute proxies, and the Director of Insurance to approve the reinsurance contract.

It is also alleged that, as a part of the reinsurance contract, policyholders desiring a policy in the insurance company could procure the same by the payment of one extra yearly premium. The insurance company made an agreement with the American Conservation Company (organized at the instance of Martin) to collect these extra premiums and retain 70 per cent thereof as compensation. The American Conservation Company, however, agreed to pay to one Nichol, a close friend of Martin, 25 per cent for his compensation, and he in turn, without receiving any consideration, turned it over to Martin. In this manner $430,000 of these extra premiums were paid the latter. When the insurance company was fully organized the shares

of Woods, Ebersole and Work were endorsed, and 800 shares were issued to Martin and 200 shares to Sawyer. Later the capital was increased $100,000, and thereby Martin owned 1600 shares and Sawyer 400 shares. Prior to the commencement of this suit Martin transferred his shares to the Chicago City Bank and Trust Company, as trustee, the rights of which it is agreed are subject to those of the plaintiffs and the insurance company, but by reason of its ownership the bank is a necessary, though nominal, party to this suit.

At this point it would appear the transaction would terminate with the transfer of the assets to the insurance company upon the assumption that all of the capital and surplus was new money paid into the insurance company. The complaint, however, alleges the capital and surplus were borrowed from a bank, with all of the stock of the insurance company, and its surplus, deposited as collateral security for notes signed by Martin, Nichol and Sawyer, and this loan was later paid from the $430,000 received by Martin from the policyholders of the assessment company, through taking new insurance in the insurance company, all engineered or manipulated at the behest of Martin and Sawyer. It is also alleged that the payments to Woods, Ebersole and Work were in the nature of bribes to procure their assistance in carrying out the plan to obtain control of the assets of the policyholders in the assessment company for the personal use of Martin and Sawyer as the owners of all of the stock in the insurance company.

As tending to substantiate the claim of the design and purpose upon the part of Martin and Sawyer to take over all of the stock in the insurance company and the assets of the assessment company, without payment of consideration, and of a breach of their duties as trustees, it is further alleged that Martin borrowed the money to pay Woods, Ebersole and Work from James W. Stevens, president of the Illinois Life Insurance Company, and gave the latter

his note for $200,000. After they obtained control of the corporate assets of the assessment company the directors of the insurance company authorized a loan to the Lincoln Investment Company for $200,000, which the latter in turn loaned to Martin, with which he paid the original loan to Stevens. No substantial part of this loan to the Lincoln Investment Company, or of an additional loan of $50,000 made to it, was ever repaid.

We are thus recounting only the salient facts alleged, as the details only go to show the manner and means of their accomplishment. There is substantial evidence to sustain the charges made in the complaint, which the circuit court found to be true, it being affirmed in its action by the Appellate Court, and it is upon such facts we will consider the pertinent principles of equity applicable thereto.

The decree of the circuit court awarded certain specific relief to plaintiffs, which in substance was affirmed by the Appellate Court, with some modifications and changes. We cannot in this opinion discuss the divergence in views of the two courts, but rather point out the principles applicable to the different situations, as shown by the proof, and thus direct the channel into which the relief afforded to the respective interests may be adjusted by the circuit court upon remandment.

The rights of the insurance company, representing as it does the policyholders in the assessment company who made contribution of an additional year's premium under the reinsurance contract, must to a certain extent depend upon the basis of relief awarded plaintiffs upon the amended complaint. If the facts justify the organization or continued existence of the insurance company, it has a clear right to maintain an action against its officers if they breach their trust. But if, on the other hand, the insurance company is in fact but a repository of the rights of the policyholders of the assessment company in whole or in part, through raising a trust in their favor, then necessarily the

relief afforded will depend upon, or be limited by the relief afforded the plaintiffs.

The assessment company was a corporation; its directors were Martin, Sawyer, Woods, Ebersole and Work. They were the agents for the corporation in the transaction of its business. While not express trustees they were regarded, while dealing with the corporation for their own benefit, as trustees. (*Dixmoor Golf Club* v. *Evans,* 325 Ill. 612; *Farwell* v. *Pyle-National Electric Headlight Co.* 289 Ill. 157; *Voorhees* v. *Mason,* 245 Ill. 256; *Ellis* v. *Ward,* 137 Ill. 509.) If considered merely as agents, still the relation of principal and agent is a fiduciary one. (*Rieger* v. *Brandt,* 329 Ill. 21; *Johnson* v. *Bernard,* 323 Ill. 527; *Voorhees* v. *Campbell,* 275 Ill. 292.) The relation of directors of a corporation to its stockholders, towards the corporation, and in many instances towards its creditors, is a fiduciary relationship. (*Dixmoor Golf Club* v. *Evans,* 325 Ill. 612; *Elting* v. *First Nat. Bank,* 173 Ill. 368; *Hoffman* v. *Reichert,* 147 Ill. 274.) *A fortiori* directors of an insurance company occupy a fiduciary relation to its policyholders when they are given the right to vote by proxy upon a proposition for a change beneficial to the proxy.

A trust may arise out of actual fraud or overreaching, or it may be presumed as arising out of a breach of fiduciary relations. While the relief that may be afforded in each case may be the same, the proof authorizing relief and accounting are materially different. Constructive fraud is simply a term applied to a great variety of transactions which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud. (Pomeroy Eq. Juris. 5th ed., sec. 922; Perry on Trusts, 7th ed., sec. 166; *Addis* v. *Grange,* 358 Ill. 127; *Mors* v. *Peterson,* 261 Ill. 532; *Noble* v. *Noble,* 255 Ill. 629; *Beach* v. *Wilton,* 244 Ill. 413; *Roby* v. *Colehour,* 135 Ill. 300.)

In *Chesterfield* v. *Janssen*, 2 Ves. 125, the court, after discussing actual fraud, added three additional classes, among which was, "that presumed from the circumstances and condition of the immediate parties to the transaction." The fraud claimed in the present case falls within this designation, although averments and evidence of actual fraud are presented in the complaint and proof.

Generally speaking, in the case of those not occupying a fiduciary relation fraud must be proved by those asserting it; and if a fund is diverted it must be identified before it can be recovered in kind or a lien imposed upon a fund with which it is commingled. A fiduciary dealing with his beneficiaries is measured by a different standard. He cannot benefit by dealing with them to their disadvantage. Therefore, directors of a corporation cannot acquire the property of the corporation without exercising the utmost good faith. (*Dixmoor Golf Club* v. *Evans*, 325 Ill. 612; *Farwell* v. *Pyle-National Electric Headlight Co.* 289 Ill. 157; Fletcher on Corpns. Perm. Ed., sec. 918; *Twin-Lick Oil Company of W. Va.* v. *Marbury*, 91 U. S. 587, 23 L. ed. 328.) The sale is presumptively fraudulent. (*Gilmore* v. *Lee*, 237 Ill. 402; *Stephens* v. *Collison*, 249 Ill. 225; *Beach* v. *Wilton*, 244 Ill. 413; Pomeroy Eq. Juris. 5th ed., sec. 918.) There are two reasons for this,—first, because of the fiduciary relationship; and second, if the directors act in their own interests there was no one to represent the corporation. (*Rieger* v. *Brandt*, 329 Ill. 21; *Johnson* v. *Bernard*, 323 Ill. 527; *Voorhees* v. *Campbell*, 275 Ill. 292.) Thus, directors who acquire title for themselves hold it in trust for the benefit of the shareholders or policyholders. The fact that they ostensibly deal with another corporation and transfer the property to it will not change the effect of the transaction, where all of the stockholders of the buying corporation are the same persons as the directors of the selling corporation, for in such case the property of the beneficiaries would merely be held by another trustee, and

if nothing be added by the ostensible purchaser no question of tracing or identification of the trust fund arises.

The distinction between trusts arising from actual fraud and those arising from a fiduciary relation has been long recognized. In other species of constructive fraud there is actual undue influence designedly exerted upon one who is susceptible because of mental weakness, old age, ignorance, necessitous condition, or the like. The existence of a fiduciary relation is unnecessary and immaterial in such cases. The fraud is established as a fact, and is the means of setting aside the transaction without the aid of a presumption. The single circumstance at this moment considered is the existence of a fiduciary relationship. The question is one when, as between the parties, influence is implied in the very conception of the relation, in which the position of one is superior to that of the other. It does not involve intentional concealment or misrepresentation, and while equity does not deny the possibility of valid transactions between the two parties, yet, because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites to overcome the presumption. *Addis* v. *Grange,* 358 Ill. 127; *Mors* v. *Peterson,* 261 Ill. 532; *Roby* v. *Colehour,* 135 Ill. 300; *Dixmoor Golf Club* v. *Evans,* 325 Ill. 612; *Stephens* v. *Collison,* 249 Ill. 225.

With this distinction in mind, it will be perceived that directors of a corporation cannot purchase from themselves. The rule has been applied even to the extent that majority stockholders cannot overreach minority stockholders in authorizing a sale to themselves, or one who represents them, (*Chicago Hansom Cab Co.* v. *Yerkes,* 141 Ill. 320-335,) and we believe would apply with equal force to one en-

trusted with the entire voting power of beneficiaries such as policyholders. The rule has been established that property which has been appropriated by another, and upon which a trust has been fixed, may in equity be followed either in its original or in its altered form, so long as it can be identified, and so long as superior rights of third parties have not intervened. *Moore* v. *Taylor*, 251 Ill. 468; Pomeroy Eq. Juris. 5th ed., sec. 1058-c.

Under this rule property obtained by directors acting in their capacity as trustees may be recovered, together with all of its increase and earnings, and the beneficiary may elect, if it so desires, to take it in its altered form. (*Vanatta* v. *Carr*, 229 Ill. 47.) It is contended in this case, however, that there can be no recovery because there is no identification of the property obtained by the individual defendants, since it comes through the corporation defendant, the insurance company. In making this contention one very important principle is overlooked, *viz.,*—there is a duty resting upon trustees not to commingle their own property with that of the beneficiaries, (*White* v. *Sherman*, 168 Ill. 589,) and when they do so commingle, in cases where the fiduciary relation exists and they have obtained the property by reason and because of the fiduciary relationship, the burden then rests upon the trustees to show by strong and convincing evidence, the property, or the part thereof that belonged to them before the commingling took place. This has been held to be true in cases where the whole fund or property belonging to the beneficiaries has been converted or purchased by the trustees. *Vanatta* v. *Carr*, 229 Ill. 47.

It is also a principle applying to the obtaining of property by a fiduciary that if it appears the property taken has been converted into a new form the beneficiaries have the right to elect whether to take such property as a substitute for the original property, improperly and illegally acquired by the trustees. And as a further guard to the rights of *cestui que trustent* equity holds defaulting trustees

jointly liable, and will not permit one trustee to sit idly by and acquiesce in the fraudulent actions of another trustee; and this is particularly true where benefits accrue to him by reason of such acquiescence. (*People* v. *Small,* 319 Ill. 437; *Dixmoor Golf Club* v. *Evans,* 325 Ill. 612.) The rule requiring honesty and fair dealing by the directors of a corporation in favor of the corporation and its stockholders is so rigid that it is practically the unanimous opinion of courts that a transaction authorized by a majority of the directors, in which one director profits, and on which he votes, and which would not have carried except for his vote, is tainted with the same illegality and fraud as though they were all interested. Fletcher Cyc. Corpns. sec. 936; *Voorhees* v. *Mason,* 245 Ill. 256; *Bloom* v. *Vehon Co.* 341 Ill. 200.

The contention is seriously urged by appellants that, the insurance company being organized in accordance with law by the independent funds of Martin and Sawyer, no recovery can be had for anything beyond the money taken from the proceeds of the one-year extra premium paid by the policyholders to the American Conservation Company. We cannot acquiesce in this contention. The money deposited to organize the insurance company was not the money of Martin and Sawyer; it was obtained by pledging that which had been taken, or was about to be taken, from the assessment company. The moment the interested directors of the assessment company created the new corporation and proposed a contract to take over the assets of the assessment company through another corporation wholly owned by them, the trust arose immediately, and while the legal title would be vested in the insurance company, it is still nevertheless the property of the assessment company, and the placing of this stock to secure the loan of $150,000 was not pledging the property of Sawyer and Martin, but was pledging the property of the assessment company. The fact that later on the $150,000 loan was paid by Martin

from earnings of the new corporation, or from profits made from the collection of the extra premiums of the policy-holders, is only confirmation that the stock in fact was bought and paid for from the assets of the assessment company, though there may be a special equity in favor of those policyholders who paid the extra year's premium to the extent of the money or hidden profit received by Martin from the American Conservation Company. The power of equity is not so frail that it cannot wrest property from fiduciaries and restore it to the rightful owners in a case where the interested directors of the selling company are the sole directors and stockholders in the buying corporation.

It will be observed that the principal difference between the holdings of the circuit court and the Appellate Court, and the views we have expressed, is in the extent of the liability of a faithless fiduciary and the presumptions arising from transactions of business with the beneficiary. We regard this case as one where the appellants stand in the shoes of fiduciaries who, to their own advantage, have dealt with property of their *cestui que trustent* without disclosure or legal confirmation of their acts. The relationship being shown by strong and unequivocal evidence, the burden of proof to establish rights in the property transferred rests upon appellants. (*Schrader* v. *Schrader,* 298 Ill. 469.) We hold the decree of the circuit court inadequate in failing to determine the ownership of the stock of the insurance company, or, in case of a sale, to dispose of the proceeds if there is a surplus above the amount of the judgments rendered against appellants. The Appellate Court did not cure this holding of the circuit court by imposing a lien upon the stock of appellants, without making provision as to the disposition of the stock after the lien had been discharged.

Appellants cite cases holding that to establish a constructive trust some element of fraud must exist at the time of the transaction. The cases cited refer to those in-

stances where actual fraud must be proved, or those where the issue involved was the existence of a fiduciary relationship. These cases are to be distinguished in that here the creation of the fiduciary relationship is not questioned, but the action of the fiduciary is the matter in issue. Corporate directors are *ipso facto* trustees in respect to their acquiring property of the corporation they represent, so, when the relationship is admitted, such a purchase is constructively fraudulent. This is not in opposition to the principle announced in the cases cited by appellants.

Appellants further contend that the result of their actions in the present case was beneficial to the policyholders. In case of constructive fraud by the officers of a corporation, where they deal for themselves and at the same time act for the corporation, it is immaterial whether the contract is fair or unfair, or whether there is good or bad faith, and it may be set aside because of the relationship of the parties. (*Higgins* v. *Lansingh,* 154 Ill. 301, 365.) Actual injury is not the principle upon which the law proceeds. (*Wardell* v. *Union Pacific Railroad Co.* 103 U. S. 651, 26 L. ed. 509.) In the *Wardell case* the directors of the railroad company made arrangements to form a corporation and own its stock, and then authorized a favorable contract for the mining of coal belonging to the railroad company with the new company. In *Pearson* v. *Concord Railway Co.* 13 Am. & Eng. Ry. Cases, 102, 62 N. H. 537, two railroad companies obtained control of the third and placed their own directors in charge of the latter, and then obtained a favorable contract by a vote of the board of directors so constituted. In both cases the contracts were invalidated.

The *Higgins case* quotes with approval the language of the *Pearson case,* and it is so apt and applicable to the present case that it will bear repetition. "The reasons for the exclusion of all inquiry into the *bona fides* of the transaction are expressed in these cases with clearness and exact-

ness, and sometimes by the learned judges in a style both quaint and pithy. Mr. Justice Field said: 'The two positions impose different obligations, and their union would at once raise a conflict between interest and duty, and, constituted as humanity is, in the majority of cases duty would be overborne in the struggle.' (*Wardell* v. *Railroad Co.* 1 Am. & Eng Ry. Cases, 427; *Marsh* v. *Whitemore,* 21 Wall. 178, 183.) 'It is to avoid the necessity of any such inquiry, in which justice might be balked, that the rule takes so general a form.' (*Jewett* v. *Miller,* 10 N. Y. 402, 405.) 'The rule is founded in the known weakness of human nature, and the peril of permitting any sort of collision between the personal interests of the individual and his duties as trustee, in his fiduciary character.' (*Duncomb* v. *Railroad Co.* 4 Am. & Eng. Ry. Cases, 293.) 'It is founded in the danger of imposition and the presumption of the existence of fraud, which is inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation.' (*Van Epps* v. *Van Epps,* 9 Paige, 237, 242; 4 Kent's Com. 438.) Lord Eldon gave as a reason 'that the inquiry is so easily baffled in a court of justice.' (*Hatch* v. *Hatch,* 9 Ves. 297.) Lord Hardwicke said: 'It is not enough for the trustee to say, "you cannot prove any fraud," as it is in his power to conceal it,' (*Whelpdale* v. *Cookson,* 1 Ves. Sr. 8.) Lord Jeffrey said: 'It is *presumptio juris et de jure* that where a person stands in these inconsistent relations of both buyer and seller there are dangers, and it is not relevant to say that it is impossible there could be any in the particular case.' (*Hughes* v. *Watson,* Scotland, 1846.) Lord Cranworth said: 'It may sometimes happen that the terms on which a trustee has dealt, or attempted to deal, with the estate or interests of those for whom he is trustee, may have been as good as could have been obtained from any other person—they may even at the time have been better; but still so inflexible is the rule that no inquiry on the subject is permitted. The

English authorities on this subject are numerous and uniform. (*Aberdeen Railway Co.* v. *Blaikie*, 1 Macq. 461, H. L. 1854.) Nothing less than incapacity is able to shut the door against temptation, where the danger is imminent and the security against discovery great. The wise policy of the law has therefore put the sting of disability into the temptation, as a defensive weapon against the strength of the danger which lies in the situation.' (*York Buildings Co.* v. *Mackenzie*, 8 Bro. P. C. 42; *Davoue* v. *Fanning*, 2 Johns. Ch. 252, 270.) * * * The justness of the contracts made with themselves, and of the votes they passed as directors of the Concord railroad for their own benefit, does not impart any validity or legality to those contracts or votes. If such contracts were to stand until shown to be fraudulent and corrupt, the result, as a general rule, would be that they must be enforced in spite of fraud or corruption. (*Flint, etc. Railroad Co.* v. *Dewey*, 14 Mich. 477.) * * * Our conclusion upon this part of the case is, that the directors of the Concord road could not make contracts with the upper roads, nor settle the claims of those roads against the Concord road. For the transaction of that part of the business of their office they were disabled by the understanding on which, the purpose for which and the interest in and by which they were elected."

The contention of actuary insolvency, (which could have been cured by increasing the yearly premiums,) does not justify disregarding the salutary principles applicable. Neither is it necessary that the company pray for a rescission of the contract, (*Dixmoor Golf Club* v. *Evans*, 325 Ill. 612,) because they may elect to recover the property or take it in kind; nor was a demand necessary for bringing suit where it would have been useless. (*Bruschke* v. *Der Nord Chicago Schuetzen Verein*, 145 Ill. 433; *People ex rel. Adams.* v. *McKibben*, 377 Ill. 22.) We are of the opinion that the assets of appellants are liable for the amounts found due by the circuit court; and further, that

plaintiffs have the right of election to disaffirm the contract, made by the directors of the assessment company with themselves through the instrumentality of the insurance company, or elect to take the stock thereof subject to whatever equity appellants may show by the investment of funds of their own, exclusive of that taken from the plaintiffs. So far as the record in the present case discloses, the entire capital stock of the insurance company was paid for by property belonging to the plaintiffs, and the total lack of consideration paid for acquiring the stock of appellants' decedents cannot be supplied by the intervention of a corporate fiction.

The circuit and Appellate courts found that the appellant Stice, who claims to be an innocent purchaser of 170 shares of Sawyer's stock, had sufficient knowledge of the transactions to deprive him of the rights of a *bona fide* purchaser for value. We have examined the record with care and are convinced that said courts are correct in making this finding, and therefore he will be ordered to reconvey the stock transferred to him, upon the payment to him of the sum fixed by the circuit court as the amount to which he is entitled.

It also appears in this record that a part of the funds converted by appellants' decedent Martin was the sum of $160,000 paid to director Woods. There is also a judgment against the Woods estate in the sum of $160,000, from which no appeal was taken. This sum was the same as that for which judgment was rendered against the Martin estate. There is nothing in the record to show whether any sum has been collected, or can be collected, from the estate of Woods. While trustees are jointly liable they are not doubly liable, and if any sum of money has been collected from the Woods estate it should not also be duplicated by collection from the Martin estate. The record leaves some question whether any funds of Martin went into the purchase of stock in the insurance company.

Under principles set out above plaintiffs were entitled to have a constructive trust in such stock declared in their favor but would not be entitled to both the stock and any money of Martin used to purchase it. This question can also be determined by the circuit court upon an accounting.

It is also true that under the authorities any money or property of the trustees actually commingled with that of the beneficiaries may be recovered, and if evidence should disclose that the Martin estate and/or the Sawyer estate have individual funds of their own invested in the stock of the insurance company they would be entitled to a return of the same. But, as pointed out above, the money obtained by loan from the bank and repaid with money or funds obtained from the American Conservation Company cannot be in equity considered the property of either of them.

The questions of *laches* and of the competency of the evidence of Nichol, and of the testimony of the directors of the assessment company before the Congressional committee, have been adequately and competently disposed of by the opinion of the Appellate Court, which we approve.

Some complaint is made that the opinion of the Appellate Court went beyond the pleadings. It is true there was no specific prayer for the imposition of a lien upon the stock of Sawyer and Martin, but examination of the complaint discloses that plaintiffs assumed a greater burden than was necessary to sustain their case, under the facts as they existed. In addition to proving that Sawyer and Martin were directors and fiduciaries, the plaintiffs allege specific facts constituting fraud. When the plaintiffs alleged the fiduciary character, and the transfer of the assets of the assessment company to the new company, that the directors of the new company were the same and the only stockholders, and that the assessment company had no representation, a fiduciary relationship being established, the transaction was constructively fraudulent, and

created that kind of a constructive trust which throws the burden of showing its fairness and propriety upon those benefiting thereby. In such case, there being a prayer for general relief, the court was authorized to decree whatever was proper to afford plaintiffs relief.

Counsel have argued other points which have received our careful consideration but which we deem unnecessary to discuss, because the principle upon which an accounting should be made is the main question involved, after determining the circuit court had jurisdiction of the suit. In order to have a proper accounting between the parties additional evidence may be required.

In both No. 28984 and 28985 the decrees of the circuit court and the judgments of the Appellate Court are reversed and the causes remanded to the circuit court, with directions to proceed in a manner consistent with the views expressed herein.

*Reversed and remanded, with directions.*

Mr. JUSTICE MURPHY took no part in the consideration or decision of this case.