Harold Shlensky and Max Shlensky, Plaintiffs-Appellees, v. South Parkway Building Corporation, an Illinois Corporation, Aleck L. Bernstein, Harry M. Englestein, Robert W. Mackie, and Louis R. Peyla, Defendants-Appellants.

Gen. No. 47,429.

First District, Third Division.
April 22, 1959.
Rehearing denied June 22, 1959.
Released for publication June 22, 1959.

Anan Raymond, Albert E. Jenner, Jr., Thomas P. Sullivan, of Chicago (Thompson, Raymond, Mayer, Jenner & Bloomstein, of counsel) for Aleck L. Bernstein, Harry M. Englestein, Robert W. Mackie, Louis R. Peyla, defendants-appellants.

Edward L. Vollers, of Chicago (Milliken, Vollers & Parsons, of counsel) for South Parkway Building Corporation, defendant-appellant.

William T. Kirby, of Chicago, for plaintiffs-appellees.

JUSTICE BRYANT delivered the opinion of the court.

This is an appeal from a decree entered in favor of Harold and Max Shlensky as stockholders of the South Parkway Building Corporation, against the South Parkway Building Corporation and four directors of that corporation, that the directors personally account to the corporation for damages allegedly suffered by the corporation in certain transactions.

All of the transactions of which complaint is made were with other corporations in which some if not all of the individual defendants, directors of the South Parkway Building Corporation, were also directors. None of the transactions were between the South Parkway Building Corporation and the named defendants directly and individually.

539

 A director of a corporation occupies a fiduciary relationship with that corporation for the benefit of its stockholders. He must act fairly and be free from all fraud or unfair conduct, and, if he becomes a party to a contract with the corporation, his obligation to candor and fair dealing is increased in the precise degree that his representative character has given him power and control from the confidence reposed in him by the stockholders. Dixmoor Golf Club, Inc. v. Evans, 325 Ill. 612, at 616. In White v. Stevens, 326 Ill. 528, after stating the above mentioned principle, the court held:

"It has also been repeatedly held that corporations having one or more common directors may contract with each other if the contracts are fair and reasonable. There is no presumption in such case that the contract is unfair or oppressive but the person attacking it must prove its unfairness."

In the case of Nagel v. Northern Illinois Gas Co., 12 Ill.App.2d 413, where ten out of the seventeen directors of the Commonwealth Edison Company were the same persons as ten of the eleven directors of the Northern Illinois Gas Company, the court cited White v. Stevens and the quotation above and stated that no presumption of want or gross inadequacy of consideration arose from the identity of the directors. The case of Winger v. Chicago Bank & Trust Co., 394 Ill. 94, involved the transfer of all of the assets of an assessment life insurance company to a legal reserve life insurance company, where the directors of the transferor held all the stock in the transferee company. The court said:

"Thus, directors who acquire title for themselves hold it in trust for the benefit of the shareholders or policyholders. The fact that they ostensibly deal with another corporation and transfer the property to it will not change the effect of the transaction, where

all of the stockholders of the buying corporation are the same persons as the directors of the selling corporation, for in such case the property of the beneficiaries would merely be held by another trustee, . . . ."

The statements of the law therein contained have particular application to the facts there involved, and the rule laid down in White v. Stevens, supra, is not changed.

Mr. Harry M. Englestein was the original promoter and developer of the property herein involved. After default and foreclosure of the mortgage on the property, it was reorganized and a new corporation formed. He acquired by the reorganization in the federal court 7% of the stock. He acquired additional stock, until he owned at least 63% of the stock of the new corporation. Plaintiffs acquired 241 shares. There were 17,773 outstanding shares of the stock in the South Parkway Building Corporation. This suit involves the rights of minority stockholders and the duties and obligations of those in charge of the corporation, the directors, in the management of the corporation.

The building, which was erected in the 1920's and is now owned by the building corporation, is a large mercantile building including space for numerous merchandising concerns including a large department store, a theater, and a large hall. It was in a sense an on-the-street shopping center.

At the time of the building the promoter organized two corporations which became tenants of the building corporation. One was the South Center Department Store, organized to operate a department store in a large part of the space. The other was the Union Amusement Company, organized to operate the ballroom space. The promoter also owned certain other vacant real estate adjacent to the building property,

and he formed another building corporation, known as the 4753 South Parkway Building Corporation, which held this vacant land. The dealings here all involve transactions between the South Parkway Building Corporation, an Illinois corporation, the corporation which arose out of the reorganization of the building in the federal court, and these three corporations, largely owned and controlled by Englestein.

Englestein was the original manager of the property. When the property was transferred to the building corporation he continued to manage the property. Englestein was employed by the trustee in bankruptcy with the approval of the federal court to continue to manage the property. After the reorganization the board of directors was composed of five members of the bondholders committee, the trustee in bankruptcy, and Englestein. The board of directors employed Englestein as management agent of the building and agreed to pay him a commission of 5% of the gross rents collected from the building corporation tenants. He had received that same compensation during the reorganization period, and that arrangement has been in effect since that time.

The South Center Department Store leased the department store space in the building from the new corporation in 1936. The Union Amusement Company leased the ballroom space on January 1, 1937. These companies had leased the same space from the building corporation's predecessor.

The first questioned transaction was the purchase of fixtures from the department store by the building corporation on March 18, 1948. The store was having merchandising problems. It was purportedly running short of working capital. In the latter part of 1947 and in January, 1948, the store had spent $84,000 for new furniture and fixtures. The department store fixtures had been purchased at a total expenditure of

$234,648.40 and were carried on the books at more than $100,000. The matter was first discussed at a board meeting held on January 15, 1948, and on March 18, 1948, the entire financial situation of the department store was presented to the board of directors of the building corporation. It was obvious that the welfare of the department store was related to the welfare of the other tenants in the building and therefore to the welfare of the building corporation. In order to improve the financial condition of the department store, the directors authorized the purchase of the fixtures for $100,000. The directors present at that meeting were the former trustee in bankruptcy, two members of the bondholders committee, Englestein, and two people who had been associated with him in business enterprises. The third bondholder-member was not present at the meeting and resigned as a director on April 2, 1948, stating that he did not approve of the fixture purchase by the building corporation. The resolution authorizing the purchase was passed unanimously by the directors who were present. Here the building corporation received the tangible assets. The successful operation of a department store in those quarters was of tremendous importance to the building corporation. It was a fair and reasonable transaction for the building corporation. As a matter of law it was not presumptively fraudulent, and as a matter of fact there was no proof that it was fraudulent.

The second transaction which is complained of is the revision in 1948 of the rent payment provisions of the department store lease. The original lease was made June 1, 1936, for ten years, at $400 per month and additional percentage rentals. In 1940 a supplemental lease was made which extended the term until May 31, 1952, at the same rental as the last eight years of the original lease. In 1946, a supplemental

.543

lease was made extending the term fifteen years, i. e., until May 31, 1967. This extension provided for a monthly payment of $600 and increased percentage rentals during the extended period, with percentage rentals starting when sales reached $760,000, instead of $600,000. All of these leases and supplements were made when Englestein had no more than one person on the board of directors who had been associated with him in business. In May, 1948, the South Center Department Store had a lease which ran until June, 1967, with rents as outlined above. On May 4, 1948, Englestein reported that the department store had become delinquent in paying its percentage rental and asked that the rental be adjusted. The board of directors which considered this matter was composed of Englestein, two people who had been associated with him in business, and two bondholders committee directors. The trustee in bankruptcy, who was out of town, subsequently approved the action taken by the board on that day. One of the bondholders committee directors suggested the following plan: that the percentage rental accrued to October 31, 1947, amounting to $14,946.34, should be extended, and that the percentage rental accrued from November 1, 1947, to June 1, 1948, $24,316.63, should be forgiven; that the minimum annual rental should be raised from $4,800 to $9,800, retroactive to November 1, 1947, which would increase the monthly payment from $400 to $816.66; that the annual percentage rental be fixed at 1½% of gross sales in excess of $1,100,000. This was a considerable reduction of percentage rental, because there was no percentage rental to $1,100,000, while previously such rental had started at $600,000 until 1952, and at $760,000 from 1952 to 1967. As the old lease had provided for 3% on gross sales from $800,000 to $1,000,000, and 2% on gross sales over $1,000,000, if the store prospered, it would be a con-

siderable reduction in the total rent to be paid. The importance to the building corporation of maintaining a department store on the premises has already been discussed. It would appear that in view of all the surrounding facts the transaction was a fair and reasonable one. The participation therein by the two bondholders committee members of the board of directors as well as the trustee in bankruptcy indicates its fairness and that there could arise no presumption from the transaction that it was fraudulent on its face.

The third transaction of which complaint is made relates to the lease of the building corporation with the Union Amusement Company and of the compensation paid to the Union Amusement Company for the surrender of the lease when a more advantageous tenant was obtained. Immediately after the organization of the new corporation in 1936, the board of directors of the building corporation authorized a ten year lease to the Union Amusement Company for the portion of the building known as the ballroom space. At that time the board of directors was composed of five bondholders committee members, the trustee in bankruptcy, and Englestein. In 1946, the lease of the Union Amusement Company was renewed for a ten year period at a minimum annual rental of $3,600 plus certain percentages of gross receipts over $117,000. At that time the board of directors was composed of three bondholders committee members, the trustee in bankruptcy, Englestein, and two persons who had been business associates of Englestein. From time to time the ballroom space had been operated as a ballroom, for indoor boxing shows, and as a skating rink. In 1947, it was decided that the space once again should be used exclusively as a ballroom, and on December 18, 1947, the board of directors of the building corporation authorized the expenditure of $35,000

to remodel the ballroom space. The board of directors at the time of that action was the same as at the time of the renewal of the Union Amusement Company lease. In March, 1948, the State of Illinois Department of Labor, Division of Placement and Unemployment Compensation, occupied a part of the second and third floors of the building corporation's building in two different tenancies totalling about 15,000 square feet. The State approached Englestein as the representative of the building corporation and offered to rent a part of the ballroom space and to vacate the space on the second and third floors which they then occupied. This arrangement would put all the State's space together and make it possible for the building to make three stores in the front of the ballroom space and to relet the second and third floor space which the State would vacate. It was estimated that this arrangement would increase the net rental of the building about $68,000 per year. There had already been spent $22,000 of the $35,000 authorized for remodelling and refurbishing the ballroom space. On May 7, 1948, the Union Amusement Company offered to the board of directors of the building corporation that it would subordinate its right under its lease in order to accomplish the proposal. As consideration it would expect to receive $\frac{1}{3}$ of the net increase in the rentals to be derived by the building corporation from the ballroom space and from the vacated 15,000 square feet of upstairs space, after the building corporation had recovered out of the net increased rentals the cost of remodelling the ballroom for the State's needs (leaving available three additional stores on the street), the cost of remodelling the space to be vacated by the State for another tenant, and the $22,000 which had already been expended by the building corporation to remodel the ballroom for use as such. After considering the offer, the directors unan-

imously resolved to accept Union's offer. There were present at that meeting two bondholders committee members, Englestein, and two men who had been business associates of Englestein. The action taken was later approved by the trustee in bankruptcy. There were only six directors at that time. There then remained approximately eight years of unexpired time in Union's lease of the ballroom space. The Union Amusement Company lease undoubtedly was under the facts involved an asset of value. The building corporation benefited substantially from the transaction. The transaction appears to be a fair and reasonable one. There is no presumption of fraud and in fact there is no evidence of fraud.

The fourth transaction of which complaint is made is the purchase of the parking lot from the 4753 South Parkway Building Corporation on February 24, 1949. Adjoining the building corporation's property immediately to the south was a vacant lot, the title to which was in the 4753 South Parkway Building Corporation. By 1948, the whole problem of furnishing parking facilities to the tenants and patrons of the building had been discussed, and on August 26, 1948, a committee of the board of directors composed of the two bondholders committee directors and the trustee in bankruptcy was appointed to study the possibility of purchasing a vacant lot for parking. On October 21, 1948, Englestein told the board of directors that he was willing to sell the property owned by the 4753 South Parkway Building Corporation. On November 24th financial arrangements in regard to the lot were discussed with the board of directors, and it was resolved to have an independent appraisal made of the lot owned by the 4753 South Parkway Building Corporation. One of the bondholders committee directors made the arrangements for the appraisal. On December 1, 1948, the vacant property

547

was appraised at $103,000 as a fair cash market value. In 1949 another business associate of Englestein was elected to the board of directors to replace a bondholders committee director who had resigned in 1948. The board was then composed of two bondholders committee directors; the former trustee in bankruptcy, Englestein, and three business associates of Englestein. For the first time Englestein and his business associates constituted a majority of the board of directors of the building corporation. By that time he owned nearly ⅔ of the outstanding stock of the building corporation. On February 17, 1949, the board of directors of the building corporation unanimously resolved to purchase the lot owned by the 4753 South Parkway Building Corporation for the sum of $100,-000. There was present at that meeting Englestein, two of his business associates, one bondholders committee director, and the former trustee in bankruptcy. It was provided that this purchase should be made if approved in writing by the other two directors who were absent, one of them being a bondholders committee director and the other being a business associate of Englestein. That approval was obtained. There was considerable testimony in regard to the value of the lot, and the master stated that he was unable to find that the consideration paid for the property was excessive, and the record certainly justifies that finding. Under the circumstances it appears to be a fair and reasonable transaction. It was not presumptively fraudulent at law, and it was not proved to be fraudulent.

The fifth transaction which is questioned relates to the provisions of a contract for the cancellation of the lease of the South Center Department Store with the building corporation on June 24, 1952. At that time the board of directors had been reduced to five in number. It consisted of one bondholders committee

548

director, the former trustee in bankruptcy, Englestein, and two business associates of Englestein. Englestein and his associates constituted a majority of the board of the building corporation. The board had been reduced from seven to five members because of the death of Mr. Lucius Teeter, who had been one of the original bondholders committee directors. The director who no longer served, to make up the reduction of two, was one of Englestein's business associates. We have previously considered the making of the original lease and the supplemental leases. At the time of this contract on June 24, 1952, the lease had another fifteen years to run until 1967, and provided for an annual guaranteed payment of $9,800 per year and a percentage payment of $1\frac{1}{2}\%$ of gross sales in excess of $1,100,000. The South Center Department Store sold its business to Meadows Mercantile Corporation. Meadows Mercantile Corporation insofar as the record shows is an entirely independent organization of experienced merchandisers in no way connected with Englestein. The sale to the Meadows Mercantile Corporation was contingent upon the South Center Department Store obtaining from the building corporation a fifteen year lease at an annual minimum of $65,000 per year and a percentage rental of $3\frac{1}{4}\%$ of gross sales in addition thereto and an option on said lease for its extension for ten years. This lease was a great deal more advantageous to the building corporation than the existing lease with the South Center Department Store. Englestein on June 19, 1952, advised the board of directors of his opportunity to sell the South Center Department Store and of the type of lease which the purchaser would negotiate. He stated that he had considered the proposition of the South Center Department Store subleasing the premises to the purchasers, but that he had decided to recommend that the building corporation cancel its

549

lease with the South Center Department Store and enter into a lease directly with the purchasers, the Meadows' Mercantile Corporation, on the more advantageous terms. This was clearly to the advantage of the building corporation, compared with the subleasing arrangement. He suggested and the other directors unanimously consented that the department store, however, should receive a substantial portion of the increase in rental. The board of directors appointed a committee to determine what portion of the increased rental would be paid to the South Center Department Store for its cancellation of the lease. That committee consisted of the remaining bondholders committee director, the former trustee in bankruptcy, and Edward Vollers, an attorney not identified as connected with the transaction in any way except as the secretary of the building corporation. At a subsequent meeting the special committee recommended that the South Center Department Store be paid $\frac{1}{3}$ of the net increase in the revenue resulting from the lease to the Meadows Mercantile Corporation, limited to a period of ten years, and to a maximum of $300,000. This recommendation was unanimously adopted by the directors. Under the contract entered into, the South Center Department Store surrendered its lease and conveyed to the building corporation certain fixtures purchased between 1948 and 1952, at a cost of $33,-629.57. The building corporation agreed to make the following payments to the department store, subject to a maximum of $300,000, which it was figured would yield $\frac{1}{3}$ of the increase in rent: $35,000 by July 31, 1953; $17,820 plus .6125% of Meadows' gross sales in excess of $2,000,000 during the year ending May 31, 1954; and $12,696 plus .4025% of Meadows' gross sales in excess of $2,000,000 during the years 1955 to 1962. On that day the lease was executed between the building corporation and the Meadows Mercantile Corpora-

tion for fifteen years with an option to renew for ten years, for rental of $3\frac{1}{4}\%$ of gross sales with an annual minimum rental of $65,000. The transaction appears to be fair and reasonable and, in the absence of a conclusive presumption, not fraudulent.

There is no substantial dispute as to the facts in this case. Englestein's connection with this promotion and the background of these transactions are not in dispute. Neither is there any dispute as to the composition of the board of directors upon reorganization. The federal court had appointed five members of the bondholders committee, potentially if not actually the greatest stockholding group. It had appointed the trustee in bankruptcy as a representative of the concern that had made the mortgage on the premises, and Englestein as the owner of the equity. There is no dispute that many of the bondholders, now stockholders, sold their stock at reduced prices, and that Englestein purchased a considerable amount thereof, and that plaintiffs so acquired their shares. There is no dispute that Englestein, because of his majority stock interest, elected his business associates to directorships in the corporation as members of the bondholders committee died or moved and were therefore unable to perform their duties as directors. Finally, there is no dispute as to what each one of the questioned transactions was or who constituted the board of directors at the time each transaction was entered into.

The only dispute is as to the application of the law to the facts and circumstances and the implication to be drawn therefrom. The Illinois rule seems to be clearly stated in White v. Stevens, which we have quoted supra, that no presumption of illegality or unfairness arises merely from the fact of interlocking directors. Fletcher on Corporations, § 973, p. 453. The weight of authority is that:

551

" 'In general the modern law has found that to forbid common directors to participate in intercorporate dealings is impractical and unworkable, and it is better to adopt an elastic rule under which the courts will scrutinize the influences at work which lead to entering into contracts through interlocking directors and determine the fairness and reasonableness of a contract if attacked.' "

Fletcher on Corporations, § 961, p. 433.

The proof in this case indicates that all of the questioned transactions are fair and reasonable, such as an ordinary businessman would enter into in the handling of his own business. It is true that in most of the cases both of the parties to the transaction received advantages from it. That is common in all business dealings. Without it there would be no dealings. Certainly under the law of the State of Illinois, where there is no presumption that these transactions are fraudulent, there is no reason for setting them aside and for granting relief to minority stockholders, unless the dealings have been proven to be so. Here there is proof that the transactions were fair and reasonable.

The decree is reversed and remanded with directions to dismiss the complaint for want of equity.

Reversed and remanded with directions.

FRIEND, P. J. and BURKE, J., concur.